No. 45,487

UNIFIED SCHOOL DISTRICT NO. 255, BARBER COUNTY, KANSAS, *Appellee* and *Cross-Appellant*, v. UNIFIED SCHOOL DISTRICT NO. 254, BARBER COUNTY, KANSAS, *Appellant.*

(463 P. 2d 499)

O. M. *Wheat,* of Medicine Lodge, argued the cause and was on the briefs for the appellant.

W. *Luke Chapin,* of Medicine Lodge, argued the cause and was on the briefs for the appellee and cross-appellant.

The opinion of the court was delivered by

KAUL, J.: This is an action by plaintiff, Unified School District No. 255, to recover equitable payment from defendant, Unified School District No. 254, under the provisions of K. S. A. 1965 Supp. 72-6776 [now K. S. A. 1968 Supp.]. The action stems from the division and disorganization of Rural High School District No. 7, Barber County, by the unification of Barber County on July 1, 1966, into two unified districts which are the parties to this action. There were some deviations from the county line between Barber and Pratt counties which are immaterial to the issues herein.

The underlying issues on appeal concern the constitutionality of 72-6776 and its application to the facts of the case.

The action below terminated in a judgment in favor of plaintiff district in the amount of $46,650.50, from which defendant district has appealed. Plaintiff district has cross-appealed as to the amount of the judgment, claiming its theory as to the application of 72-6776 should have been adopted by the trial court and a judgment entered for an equitable payment in the amount of $81,221.78.

There is no dispute about the facts but the materiality thereof is questioned in certain instances.

We shall refer to plaintiff-appellee as plaintiff, or No. 255, to defendant-appellant as defendant, or No. 254, and Rural High School District No. 7, which was disorganized by unification, as RHS No. 7.

Under the Second Unification Act (Laws of 1965, Chapter 420), Barber County, on July 1, 1966, was divided into two unified districts; USD No. 255 consisting of the southern part of the county, with its office at Kiowa; and USD No. 254 consisting of the northern part of the county, with its office at Medicine Lodge. Disorganized RHS No. 7 was divided between the two new unified districts, 84.88 percent of its territory, calculated on assessed valuation, was

attached to No. 254 and the balance, consisting of 15.12 percent was attached to No. 255.

The unification also disorganized several other smaller districts, three of which were divided by the detachment of a small portion of the preexisting territories.

RHS No. 7 owned a high school building, constructed in 1960-61 at Medicine Lodge, for which RHS No. 7 incurred a bonded indebtedness of $490,000.00. On July 1, 1966, a balance of $370,000 remained which was further reduced by a payment on September 1, 1966, of principal and interest which had been raised by levy and budgeted in the amount of $38,318.96. As a result, at the time of unification, the bonded indebtedness on RHS No. 7 amounted to $346,000.00, the sum to be considered in this action.

Under the provisions of K. S. A. 1965 Supp. 72-6775 (c) [now K. S. A. 1968 Supp.], and K. S. A. 10-119, the balance of the bonded indebtedness of RHS No. 7 remained a charge upon the territory even though the district was disorganized.

The division of disorganized RHS No 7, with its building in Medicine Lodge attached to No. 255, and the remaining bonded indebtedness of $346,000, brought into play the provisions of 72-6776 which read as follows:

"(a) Where a unified district acquires a school building of a divided disorganized district and the bonded indebtedness for such building is only partly paid, the unified district acquiring such building may either pay to or receive from each other district or districts in which any part of the territory of the disorganized district is located an equitable payment. Such equitable payment, if any, shall be determined as follows: (1) The boards of the interested districts shall negotiate and agree upon such payments, if possible; (2) if such agreement cannot be reached, the board of any interested district may file an action at any time after January 1, 1967, and before January 1, 1968, in the district court of the county in which such school building is located, to determine such equitable payments; (3) the district court in which such an action is filed shall determine venue of the action, and if venue is found to be in such court, shall appoint a commissioner and may appoint appraisers to determine any facts or valuations that the court deems material; (4) the commissioner, and appraisers if any, shall report their findings to the court together with any recommendations requested by the court; (5) the court may hear evidence and shall hear arguments of interested districts; (6) thereafter the court shall issue its order determining such equitable payments, if any, allowing rasonable fees to the commissioner and appraisers, if any, and assessing the costs of action, including such fees, to the litigants or any one or more of them.

"(b) Any unified district making payments under this section is authorized

to levy taxes over a period of three (3) years to obtain funds to make such payments, and such levy shall be in addition to all other tax levies authorized or limited by law and shall not be subject to or within any aggregate tax levy limit.

"(c) Such equitable considerations as are deemed, by such negotiating boards or such court, to be appropriate may be considered."

Following the unification and the disorganization of RHS No. 7, the Boards of No. 254 and No. 255 met and attempted to negotiate and agree upon an equitable payment as provided for in 72-6776. Their efforts were unsuccessful. Thereafter, on August 29, 1966, which was within the time specified in 72-6776 (a) (2), No. 255 filed this action. The district court, as provided for in 72-6776 (a) (3), determined venue and appointed Paul R. Wunsch, of Kingman, as commissioner to determine appropriate and necessary facts and make proper recommendations to the court as to whether or not No. 254 should be ordered to make equitable payments to No. 255, as contemplated by 72-6776, and if such payments were recommended the amount was to be specified.

Thereafter, the commissioner proceeded to hold a hearing at which many of the facts were stipulated and written evidence was offered by the respective parties. Subsequently, the parties submitted supplemental offers of evidence, consisting of information which was agreed to be true and correct, but each party objected to the materiality of some of the evidence offered by the other.

The commissioner considered all of the information which was submitted, even though he noted some was immaterial. All of the information was made a part of his report so, as he says, it might be of some assistance to the court in determining the issues presented.

The commissioner found 72-6776 to be constitutional, although he expressed misgivings in this regard. The commissioner determined since No. 254 acquired the portion of RHS No. 7, which included the high school building, an equitable payment should be made by No. 254 for the benefit of the taxpayers of that portion of RHS No. 7, which became a part of No. 255. The commissioner calculated what he considered to be an equitable adjustment, based primarily on the remaining bonded indebtedness of RHS No. 7, at the time of the unification. He concluded that an equitable payment of $41,500.00 should be made by No. 254 to No. 255 for the benefit of taxpayers formerly in the territory of RHS No. 7, but who now were in No. 255.

Both parties filed motions to confirm the report of the commissioner with certain exceptions. There was no request by either party to present additional evidence to the court. The court struck findings of the commissioner with respect to an offset in the amount of $5,150.50, which the commissioner had determined to be a lump sum equitable adjustment by reason of the fact that disorganized School District No. 28 (Sharon) and disorganized School District No. 43 (Isabel), both had school buildings and facilities and were maintaining schools, but became a part of No. 254. The result of the trial court's determination was to reinstate the amount of $46,650.50, arrived at by the commissioner, before making the lump sum offset referred to. Except for several findings, which were stricken on the ground of immateriality, the commissioner's report was otherwise approved and adopted by the court.

Findings and computations made by the commissioner and the trial court will be discussed further in the second chapter of this opinion.

We shall consider first defendant's attack on the constitutionality of 72-6776, *supra.*

No complaint is made concerning the procedural steps enumerated in subsections (*a*) and (*b*). The challenge is directed specifically at subsection (*c*).

Prefatory to our consideration of the contentions of defendant, we refer to long and well-established rules of this jurisdiction that the constitutionality of a statute is presumed and that all doubts must be resolved in favor of its legality and before the statute may be stricken down it must clearly appear the statute violates the constitution. (See Hatcher's Kansas Digest [Rev. Ed.], Constitutional Law, § 16; West's Kansas Digest, Constitutional Law, § 48.)

The ambit of judicial examination of a law is prescribed in *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P. 2d 71, where it is held:

"Judicial examination of any law enacted by the legislature proceeds on the assumption that it is valid unless it contravenes an express inhibition of the constitution or one necessarily implied from some express affirmative provision of that instrument, and an act of the legislature is not to be stricken down on the ground it is unconstitutional unless infringement of the superior law is clear beyond substantial doubts" (Syl. ¶ 2.)

Defendant claims the use of "such equitable considerations as are deemed appropriate," in determining the equitable payment as directed in subsection (*c*) is insufficient to meet constitutional re-

quirements of statutory definiteness and certainty. It is argued the language used does not prescribe a certain or fixed guideline and therefor the statute must fall.

We cannot agree with the position taken by defendant.

Although neither 72-6776 nor its immediate predecessor K. S. A. 72-6751 [repealed, Laws of 1965, Ch. 420, Sec. 29] have been considered by this court, the application of equitable considerations in resolving problems arising from a transfer of school district territory is not a new subject in this jurisdiction. The matter has had the attention of the legislature and courts since 1868.

Under the provisions of G. S. 1868, ch. 92, §§ 50, 51, where a new school district formed in part from territory previously belonging to another district, possessing a school house, the county superintendent was directed to determine the proportion of the value of such school house or other property justly due the new district. Although not challenged on constitutional grounds, the 1868 statute was considered in *School District v. The State*, 15 Kan. 43, where the county superintendent failed to make the required determination until seven months after the new district was formed. In this early case the application of equitable principles in adjusting inequities, following a change in school district territories, was recognized. The court stated:

". . . It is fair, and just, and equitable, when a school district is divided into two new districts, that each should have its fair proportion of the value of the property belonging to the old district at the time of the division. Or what is the same thing, it is fair when a new district is carved out of an old one that the new district should have its fair proportion of the property or value thereof which belonged to the old district at the time the new one was created. And this fairness, equity and justice we think is more of the essence of the law, than mere time in making the apportionment. . . ." (p. 47.)

In *School District v. School District*, 32 Kan. 132, 4 Pac. 189, it was held a divided district was "equitably" entitled to an apportionment made by the county superintendent.

The decision in *Board of Education v. School District*, 45 Kan. 560, 26 Pac. 13 (1888), indicates that equitable considerations compel an equitable adjustment even in the absence of any statutory direction. This case arose prior to the enactment of legislation providing for an adjustment when a school district is divided by an extension of city limits. The court declared:

"The decision of this case must be controlled by equitable considerations: for while the statutes of the state have made provisions for the disposition of

the property of a school district when the same is abolished or discontinued, and when a school district is divided by the county superintendent, or when by his action a part of the territory of a school district is detached and put into another or new district, no express provision is made where a school district is divided by reason of an extension of city limits absorbing a part of it. . . ." (p. 561.)

Following the decision the legislature provided for an "equitable apportionment" when a district is divided by an extension of city limits by enacting Chapter 128, Section 2, Laws of 1893, a forerunner of K. S. A. 72-5316a, *et seq.* (repealed, Laws of 1969, Chapter 312, Section 6.)

The statutes last referred to (72-5316a, *et seq.*) were considered by this court in the recent case of *Williams v. Board of Education,* 198 Kan. 115, 422 P. 2d 874. The problem therein concerned adjustments necessitated by a change in school district territory, brought about by a city annexation. Though no constitutional question was involved, we believe language found in the opinion is germane to the issue here. In *Williams* the legislative history of 72-5316a, *et seq.* was traced and then it was stated:

". . . While subsequent legislation has provided greater detail for making the adjustment in each individual case, the principle of equitable apportionment continues as a thread throughout the enactments. (See R. S. 1923, 72-5317 and 5318; G. S. 1949, 72-5317 and 5318; L. 1951, ch. 407; L. 1953, ch. 335; L. 1957, ch. 395.)" (p. 120.)

Further in the opinion we find this statement:

". . . The legislature, in enacting the foregoing statutes, has recognized that differing factual situations may arise, and has provided a flexible means of equalizing the resultant economic imbalances." (p. 121.)

While constitutional questions were not raised, we believe the cases and statutes referred to adequately demonstrate the term "equitable considerations" or variations thereof are quite familiar to, and commonly used by, both the legislature and this court in dealing with adjustments between school districts.

Reduced to simple terms the statute merely tells the court to use appropriate equitable considerations in determining what payment, if any, is to be made; in other words, a direction to the court to use its equitable powers. There is nothing new or unusual in such a legislative mandate, for example we find language of similar import directing resort to equitable considerations in determining alimony (K. S. A. 1968 Supp. 60-1610[c]); and in equity powers conferred in confirming a sheriff's sale (K. S. A. 60-2415[b]).

It is a distinguishing feature of equity jurisdiction that it possesses full power to apply settled rules to unusual conditions and to mold its decree so as to do equity between the parties. (*Stady v. Texas Company*, 150 Kan. 420, 94 P. 2d 322, and *Hultz v. Taylor*, 163 Kan. 180, 181 P. 2d 515.)

Courts deal constantly with the application of equity maxims and equitable considerations. The meaning of the terminology is well developed and has been familiar to courts from the beginning of equity jurisprudence. The terms "equitable" and "inequitable" have been judicially determined to signify just and unjust. (27 Am. Jur. 2d, Equity, § 1, p. 516.) In Black's Law Dictionary (Fourth Edition) we find the term equitable defined as "just, fair, and right, in consideration of the facts and circumstances of the individual case." (p. 632.)

A statute will not be declared void for vagueness and uncertainty where it employs words commonly used, previously judicially defined, or having a settled meaning in law. (50 Am. Jur., Statutes, § 473, pp. 486, 490.)

We believe a statutory mandate directing the determination of an equitable payment by the employment of equitable considerations deemed appropriate prescribes a guideline well within the constitutional requirements of certainty.

At this point, we should pause to note that even though the immediate predecessor of 72-6776, *supra*, K. S. A. 72-6751 prescribed, in subsection (*f*) (2) thereof, a guideline based primarily on factors of original costs, depreciation and bond payments made previous to the unification; it also included in subsection (*f*) (3) a provision that such other equitable considerations as deemed appropriate, by the negotiating boards or the court, might be considered.

The omission of the guideline prescribed in subsection (*f*) (2) of 72-6751 in the enactment of 72-6776 clearly indicates the legislature was dissatisfied with the concept expressed in the former law and desired the more flexible method, based on equitable considerations, prescribed in 72-6776. The change was a matter of legislative choice.

Courts do not pass on the wisdom of acts of the legislature. Legislative policy is neither approved nor condemned by courts; their sole function is to determine the validity of a challenged act when measured by applicable constitutional provisions. (*Tecumseh*

*School District v. Throckmorton,* 195 Kan. 144, 403 P. 2d 102; *State, ex rel., v. City of Pittsburg,* supra.)

The views expressed herein are in line with the decisions of other jurisdictions dealing with similar statutes.

In *State, ex rel., Bd of Edn.,* 172 O. S. 533, 179 N. E. 2d 347 (1961), the constitutionality of an Ohio statute, which directed the State Board of Education to make an equitable division of funds and indebtedness between the districts involved when territory was transferred from one district to another, was challenged on the ground it provided no guide or standard for the board to follow other than that the division must be equitable. In answering the challenge it was stated:

"At the time of the transfer in the instant case, Section 3311.06, Revised Code, contained the requirements that 'an equitable division of the funds and indebtedness between the districts involved shall be made.' In other words, the division must be fair and just to all involved. The statute does not provide a rigid formula such as tax valuation alone. Rather, it establishes the broader and more feasible test that the division must be equitable under the particular circumstances of each situation . . . The statute is not unconstitutional." (p. 535.)

A Michigan statute enacted to serve the same purpose was challenged on the same grounds in *Lansing Dist. v. State Bd. of Ed.,* 367 Mich. 591, 116 N. W. 2d 866 (1962). The challenge was rejected and referring to the statute involved the court stated:

". . . It provided the county board or joint board's shall determine whether any personal property is to be transferred and, when any real property owned by a school district is transferred to another district, determine an equitable payment for the taking of such property. . . .

"The legislature certainly expected the board or joint boards, in determining 'equitable payment' for property taken, would exercise its discretion gained through its business experience, time in the community, and knowledge of property values, all gained as a result of experience in educational matters. Any abuse of the board's discretion would be subject to judicial review." (p. 598.)

We next turn to the question whether the payment determined here was equitable.

The purpose of the equitable payment provision of 72-6776, *supra,* is to adjust equities between a unified school district and detached territory of a school district divided by unification where a school building is acquired by the former and the bonded indebtedness is only partly paid. The import of the statute is that an equitable payment may be paid or received between the districts if the

court determines equity compels a payment under the equitable considerations deemed appropriate under the existing circumstances of each particular case. The legislature, realizing the precise results of unification in each particular case could not be predicted, adopted a flexible approach and directed equities to be adjusted under applicable and appropriate equitable considerations.

We shall consider the application of equitable considerations to the facts of the instant case.

At the outset of our consideration of this point, we should note that the commissioner, in his report, carefully reviewed the procedural steps of the proceedings and then made twenty-four detailed findings. The commissioner's findings reflect a careful and meticulous consideration of all material facts and a conscientious attempt to apply appropriate equitable considerations. Limitations of space prohibit a full recitation of the commissioner's findings. We shall mention only those facts necessary to convey an understanding of the issues and disposition thereof.

The facts discloses that in addition to that portion of RHS No. 7, attached by unification, No. 254 also included considerable other territory. Principal parts of this additional territory should be noted.

Sun City Rural High School District No. 2 had an assessed valuation of $1,607,801, and no bonded indebtedness. It had a school building constructed prior to 1920 which was adequate for present attendance needs and would probably never be replaced. There was no division of the Sun City territory, all of which was attached to No. 254 by the unification.

Isabel Common School District No. 43, which extended partially into Pratt County, had an assessed valuation of $2,957,271, and no bonded indebtedness. The Isabel district maintains school in a building constructed in 1920 and added to in 1950. The superintendent of No. 254 noted that Isabel's shop and gym were adequate but the old building should be abandoned. However, he commented "but under current laws it is likely that an elementary school will exist there for many years." There was no division of the Isabel territory, all of which was attached to No. 254 by unification.

Sharon Common School District No. 28 had an assessed valuation of $1,607,801, and no bonded indebtedness. It had a school building constructed in 1960, with insurance proceeds and $200,000 in bonds, of which $146,477.26 remained outstanding. Calculated from the ratio of respective assessed valuations, 99.5 percent of the

Sharon District became a part of No. 254 and the balance of .5 percent was attached to No. 255 by unification. At the time of trial Sharon's facilities were adequate for the foreseeable future except for a shop building. The evidence disclosed that the construction of a $100,000 shop building was planned for 1968. We are informed on oral argument that this building is now under construction.

Hardtner School District No. 62B and Hazelton School District No. 37 and District No. 6 were also disorganized by the unification.

Hardtner had an assessed valuation of $3,168,142; 95.42 percent of which was attached to No. 255 and the balance of 4.58 percent was attached to No. 254. A bonded indebtedness, stemming from two bond issues, totaled $118,000, at the time of unification, and remained as an obligation of the disorganized district.

Hazelton Districts had an assessed valuation of $1,921,009; 96.25 percent of which was attached to No. 255 and the remainder of 3.75 percent was attached to No. 254. At the time of unification Hazelton No. 37 had a bonded indebtedness of $9,000.00 which remained as an obligation of the disorganized district.

The superintendent of District No. 255 reported that the Kiowa High School, the principal high school in the district, was over fifty years old and both the State Department of Education and the North Central Accreditation Agency were insisting that a new high school be built for the district.

As we have noted, the facts presented to the commissioner were either stipulated or agreed, the only dispute concerns materiality.

On the effective date of unification, July 1, 1966, RHS No. 7 had an assessed valuation of $15,108,290, of which $2,285,264 was on property which became attached to plaintiff. RHS No. 7 owned a relatively new high school building, constructed in 1961 out of a total bond issue of $788,000, of which, bonds in the amount of $490,-000 were issued by RHS No. 7 and the balance of the bonds— $298,000.00, was issued by the Medicine Lodge Common School District No. 1.

A balance of $370,000 remained as bonded indebtedness of RHS No. 7 on July 1, 1966, which, as we have previously noted, was further reduced by a payment on September 1, 1966, of principal and interest in the amount of $38,318.98. As a result, the net outstanding bonded indebtedness amounted to $346,000, which was considered with respect to the disorganization of RHS No. 7. The

remaining bonds matured at the rate of $24,000 per year through 1969, then $25,000 per year until paid in full in 1980. Interest rates varied from 3.9 percent to 4.25 percent according to dates of maturity.

The commissioner further found from the records of the county treasurer that by reason of back taxes collected and disbursed, and estimated future collections of back taxes, the net obligation by reason of the bonded indebtedness amounted to $341,666.74, which sum was used as a starting point by the commissioner in making his computations with respect to RHS No. 7.

The commissioner used the agreed total valuation of RHS No. 7, prior to unification and the valuation of the portion attached to No. 255, as factors in arriving at 15.12 percent, which was multiplied by $341,666.74 resulting in the sum of $51,660.01. This sum was used as a beginning figure by the commissioner and was modified by other factors which he found to be equitable considerations in arriving at his final figure of $41,500; the sum determined by the commissioner to be the equitable payment that should be received by No. 255 from No. 254.

In Findings Nos. 23 and 24 of his report, the commissioner made findings and recommendations which were fully approved and adopted by the trial court. The commissioner noted that the bonds bear interest which must be paid as well as the bonds, but he pointed out that the equitable payment would be made under 72-6776 (b), *supra,* by a levy in the next three years. If the tax money were placed on interest, in government securities, as recommended by the commissioner and ordered by the trial court, the interest received on the impounded funds would offset the interest on the bonds which matured annually through 1980.

In addition to his findings with respect to RHS No. 7, the commissioner used the same method in computing adjustments with respect to the bonded indebtedness of Hardtner, Hazelton No. 37, and Sharon.

In the case of Hardtner, whose building along with 95.15 percent of its territory was attached to No. 255, the commissioner found that $5,404.40 (4.58 percent of $118,000) should be credited to No. 254 to offset the remaining obligation of the taxpayers occupying the 4.58 percent of the territory attached to No. 254.

Likewise, in the case of Hazelton No. 37, whose building along with 96.25 percent of its territory was attached to No. 255, the com-

missioner found that $337.50 (3.75 percent of $9,000) should be credited to No. 254 to offset the remaining obligation of the taxpayers occupying the 3.75 percent of the territory attached to No. 254.

In the case of Sharon, whose building along with 99.5 percent of its territory was attached to No. 254, the commissioner found that $732.39 (.5 percent of $146,477.26) should be credited to No. 255 to offset the remaining obligation of the taxpayers occupying the .5 percent of the territory attached to No. 255.

The commissioner then offset the $732.39, due No. 255, against the $5,741.90 ($5,404.40 plus $337.50), due No. 254, and arrived at a net adjustment of $5,009.51 in favor of No. 254. The commissioner then subtracted $5,009.51 from $51,660.01, which had been determined to be the equitable payment with respect to RHS No. 7. This arithmetic resulted in the sum of $46,650.50 which was further modified by subtracting $5,150.50 resulting in the $41,500 equitable payment recommended by the commissioner.

The sum of $5,150.50, subtracted by the commissioner, appears to be a discount or adjustment he arrived at by reasoning that Isabel and Sharon both had their own school buildings, were maintaining schools, were not a part of RHS No. 7 and were not in anywise obligated to pay any of the bonded indebtedness of RHS No. 7 on July 1, 1966. On motion of the plaintiff Findings Nos. 21(e) and (f) and 22, pertaining to the lump sum adjustment, were stricken by the trial court and the $5,150.50 reinstated, raising the equitable payment to $46,650.50, the final judgment entered. It is this ruling of the trial court that draws the principal attack by defendant on the method employed in determining the equitable payment.

Defendant asserts the trial court disregarded equities as to the territory of No. 254, in particular Sharon and Isabel which had not been a part of RHS No. 7 and was not obligated for any of its bonds. It is argued the fact that both Sharon and Isabel were maintaining schools and not receiving any benefits from the Medicine Lodge facilities must be considered in arriving at any equitable payment. With respect to Sharon, in particular, since it has its own indebtedness to pay, defendant strenuously argues that the burden of contributing to an equitable payment for the benefit of the detached portion of RHS No. 7 works an extreme hardship.

Plaintiff presents a different picture. In objecting to the commissioner's findings concerning the lump sum discount, No. 255 stated:

". . . Regardless of where students attend high school, regardless of amounts of bonds outstanding in the old Isabel and Sharon Districts, were it not for the fact that Rural High No. 7 constructed a new high school building at Medicine Lodge in 1960, the first thing that U. S. D. # 254 would have to have done after July 1, 1966, would have been to build a new high school for Medicine Lodge, and Isabel, Sharon and the rest of U. S. D. # 254 would be paying for that high school building."

We have already noted that Sharon is receiving a new shop building which will be constructed by the entire No. 254 district.

With respect to Isabel, it may be inferred from the report of the superintendent of No. 254 that Isabel high school students will be transferred to Medicine Lodge in the near future.

It should be noted with respect to No. 255 that Hardtner and Hazelton No. 37 both have prior bond obligations but the evidence indicates they will be immediately called upon to share the expense of a new district high school building in Kiowa.

From our examination of the record we believe all of the material equitable considerations were presented and carefully weighed by the commissioner and the trial court. We cannot say it is inequitable to require a payment from No. 254 for the benefit of those RHS No. 7 taxpayers now in No. 255, who have suffered the loss of school facilities they have helped pay for and will continue to help pay for and now face the additional burden of providing new school facilities in their new district. Neither can we say the sum of the payment arrived at or the method employed is inequitable or unfair. We think the same reasoning applies as well to the Hardtner, Hazelton No. 37 and Sharon Districts.

However, our consideration of the record has led us to the conclusion that the judgment of the trial court with respect to the disbursement of the equitable payment must be modified.

In its judgment the trial court directed that the sum of $46,640.50 should be raised by a tax levy spread against all of No. 254, the levy to be sufficient to raise one-third of said sum in each year for a period of three years.

The trial court further ordered that when received by the county treasurer of Barber County the moneys should be placed in a special fund and invested in interest bearing obligations of the United States or its agencies, and that the taxpayers formerly in the territory comprising disorganized RHS No. 7, not now included in No. 254, should be given credit, as and from the year of first receipt of such special fund, against any tax levied against their property for

the payment of bonds obligating the property formerly comprising disorganized RHS No. 7, to the extent that such funds will offset such tax levies.

This portion of the judgment of the trial court was made pursuant to the provisions of K. S. A. 1968 Supp. 72-67,109 which provides in substance that any court order made pursuant to 72-6776, *supra,* may direct that any payment made from one unified district to another shall be applied to a particular purpose or to the benefit of a particular area. The statute further provides:

". . . It is recognized by this section that in certain cases payments should be made to benefit taxpayers in localized areas of unified districts, . . ."

In entering its judgment, directing the disbursement of equitable payment as aforesaid, the trial judge recognized that the taxpayers of RHS No. 7, attached to No. 254, should receive benefits from the equitable payment but even though the status of detached taxpayers in disorganized Sharon, Hardtner and Hazelton No. 37 was recognized and equitable sums computed, no disbursements for their benefit was directed.

Although the commissioner computed payments for the detached portions of the districts referred to and included the sums in the total equitable payment, he did not allocate the respective sums to the detached territories affected. He concluded:

"In my opinion this would be more burdensome than the benefits accruing to the individual taxpayers involved."

The trial court apparently went along with the commissioner's reasoning in this regard. We cannot agree. We believe equity compels the application of 72-67,109 for the benefit of detached taxpayers of Sharon, Hardtner and Hazelton No. 37 in the same manner as those occupying the detached territory of RHS No. 7. Since, in any event, a separate bond account must be maintained with respect to the unpaid bonds of each of the three districts referred to, we cannot see any unreasonable bookkeeping burden in securing the benefits to the respective taxpayers entitled thereto. While the sums involved are not large, we are not informed as to the number of taxpayers involved, if only a few, then the benefits to an individual might be substantial.

We hold, therefore, the district court's judgment should be modified so as to establish separate funds to be invested and disbursed for the benefit of detached taxpayers of Hardtner, Hazelton No. 37

and Sharon in like manner and method as that directed with respect to the detached taxpayers of RHS No. 7.

Finally, we turn to the cross-appeal. Plaintiff objected to the method used by the commissioner in relying primarily on unpaid bonded indebtedness in arriving at an equitable payment, and argued that it should be based upon the value of property taken over by No. 254. Plaintiff's proposal was rejected by the commissioner and by the trial court. Plaintiff reasserts it now on cross-appeal.

Plaintiff suggests the property valuation method be applied by totaling all of the property of RHS No. 7, turned over to No. 254, which according to agreed values amounted to $609,445. Plaintiff multiplies by 15.12 percent (the assessed values reduced to percentage) and obtains a figure of $92,148.08; allowances are then made for adjustments for Hardtner and Hazelton No. 37 totaling $12,154.41, subtracted from $92,148.08 leaving $79,993.67. To this plaintiff adds an adjustment for Sharon in the amount of $1,228.11, totaling $81,221.78, which plaintiff claims should be the equitable payment rather than the $46,650.50 arrived at by the trial court; via the bonded indebtedness method.

We believe what has already been said concerning the equitable considerations disposes of plaintiff's cross-appeal. However, we shall briefly discuss some of the matters involved.

It must be conceded that the use of a valuation method is not prohibited by the statute, since the existence of a bonded indebtedness is specified only as a qualification for the application of the statute. On the other hand, since bonded indebtedness is specified as a qualification then surely it may be used as a basis for computation of equitable payment if the application of such method appears to be equitable and there is no valid reason pointed out in this case, why the use of the bonded indebtedness method does not reach equitable results.

Moreover, the commissioner stated his reasons for not using the property valuation method in his Finding No. 18 which reads as follows:

"Your commissioner does not believe that the value of the property received by USD # 254 from disorganized Rural High School District No. 7 as of July 1, 1966 (whatever such value might be) should be considered in arriving at what should be the equitable payment in this action for the reason that 37.817% of the cost of constructing the Medicine Lodge High School building was from funds furnished by the Medicine Lodge Common School District No. 1, and

further, although not shown by the evidence, some of the personal property was undoubtedly contributed by the Medicine Lodge Common School District No. 1."

The trial court adopted the reasoning of the commissioner and we find no reason to disturb its ruling in this regard.

The judgment of the trial court is affirmed as modified with directions to enter judgment effecting the modifications directed herein.