No. 70,931

(92-CV-1099)
UNIFIED SCHOOL DISTRICT NO. 229, *et al.*, *Appellants*,
v. THE STATE OF KANSAS, *et al.*, *Appellees*.

(92-CV-1202)
UNIFIED SCHOOL DISTRICT NO. 217, *et al.*, *Appellants*,
v. THE STATE OF KANSAS, *et al.*, *Appellees*.

(92-CV-1175)
UNIFIED SCHOOL DISTRICT NO. 244, *et al.*, *Appellants*,
v. THE STATE OF KANSAS, *et al.*, *Appellees*.

(92-CV-2406)
UNIFIED SCHOOL DISTRICT NO. 373, *et al.*, *Appellees*,
v. THE STATE OF KANSAS, *et al.*, *Appellants*.
(885 P.2d 1170)

Opinion filed December 2, 1994.

*John L. Vratil*, of Lathrop & Norquist, L.C., of Overland Park, argued the cause and *Patrick J. Gregory*, of the same firm, was with him on the brief for appellants Unified School District No. 229, *et al.*

*Alan E. Popkin*, of Husch & Eppenberger, of St. Louis, Missouri, argued the cause, and *Harry B. Wilson, Daniel N. Bloom,* and *Karen Halbrook*, of the same firm, were with him on the brief for appellants Unified School District No. 217, *et al.*

*Robert J. Perry*, of Perry, Hamill & Fillmore, L.C., of Overland Park, argued the cause, and *Thomas A. Hamill* and *Gregory M. Dennis*, of the same firm, and *Bryan K. Joy,* of Burlington, were with him on the brief for appellants Unified School District No. 244, *et al.*

*Carl L. Gallagher*, assistant attorney general, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the briefs for appellant State of Kansas.

*Alan L. Rupe*, of Rupe & Girard Law Offices, P.A., of Wichita, argued the cause, and *Steven J. Rupp*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the brief for appellees Unified School District No. 373, *et al.*

*Dan Biles*, of Gates & Clyde, Chartered, of Overland Park, argued the cause, and *Rodney J. Bieker,* of the Kansas State Department of Education, was on the brief for appellee Kansas State Board of Education.

The opinion of the court was delivered by

MCFARLAND, J.: In these four consolidated actions, 97 plaintiffs, including unified school districts, taxpayers, and students, challenge the constitutionality of the School District Finance and Quality Performance Act. The 1992 legislature enacted Senate Substitute for H.B. 2892 (L. 1992, ch. 280). This massive bill

contains 69 sections, although only the first 36 sections thereof are designated as the School District Finance and Quality Performance Act. The bulk of the Act is codified at K.S.A. 72-6405 *et seq.*, although some of the first 36 sections and the undesignated remaining 33 sections are, in codification, widely scattered in the Kansas Statutes. For our purposes, unless otherwise noted, we will refer to L. 1992, ch. 280 as the Act, which also encompasses subsequent legislative amendments thereto.

The district court upheld the Act against challenges that it was constitutionally impermissible as being violative of:

1. Article 6, § 5 of the Kansas Constitution by infringing upon the authority granted to locally elected school boards to maintain, develop, and operate local public schools;

2. Article 6, § 6(b) of the Kansas Constitution in that it does not contain "suitable provision for finance of the educational interests of the state";

3. Section 1 of the Bill of Rights of the Kansas Constitution concerning equal protection (except for the low enrollment weighting factor);

4. Article 2, § 16 of the Kansas Constitution as containing more than one subject;

5. The Fifth and Fourteenth Amendments to the United States Constitution and §§ 1 and 2 of the Bill of Rights of the Kansas Constitution on the claim that recapture funds provisions of K.S.A. 72-6431(d) constitute an excessive "taking" of property; and

6. Article 2, § 17 of the Kansas Constitution as a law of a general nature which does not operate uniformly throughout the state.

As to the low enrollment weighting factor, the district court held:

The record did not "contain a rational basis grounded upon education theory for distinguishing" between districts containing more than 1,899 students and those having fewer students; the low enrollment provision could not be severed from the Act; and the Act was, accordingly, unconstitutional.

Each of the foregoing holdings of the district court is an issue before us via interlocutory appeal or cross-appeal. Additionally, the district court held that a provision of the Act that set the school districts' mill levy for a period in excess of two years was constitutionally impermissible but was severable. However, that infirmity has been corrected by the 1994 legislature and is not before us.

The Act is, arguably, the most significant single piece of legislation ever enacted by the Kansas Legislature in terms of the amount of tax dollars involved and its impact on the citizens of Kansas. The Act represents a major policy shift in how public school education is viewed and how it is to be funded. That the magnitude of the change contained in the Act has generated such a firestorm of protest in a number of areas of the State is not surprising. The Act has been through the legislative process, was amended in many respects on its way to enactment, and became the law of this state. The consolidated actions herein are challenges to the constitutionality of the legislation. Accordingly, the judiciary's role is very limited in its scope. The wisdom or desirability of the legislation is not before us. The constitutional challenge goes only to testing the legislature's power to enact the legislation.

In *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 845 P.2d 676 (1993), constitutional challenges were asserted, as in the case before us, that certain legislation violated provisions of Article 6 of the Kansas Constitution. In discussing the court's limited role in such matters, we stated:

"In considering the constitutionality of a statute duly enacted by the legislature, certain basic principles and rules apply.

'When a statute is attacked as unconstitutional a presumption of constitutionality exists and the statute must be allowed to stand unless it is shown to violate a clear constitutional inhibition. *Shawnee Hills Mobile Homes, Inc. v. Rural Water District*, 217 Kan. 421, 435, 537 P.2d 210 (1975). It is generally agreed that the Kansas Constitution limits rather than confers power and any power and authority not limited by the constitution remains with the people and their legislators. In *Leek v. Theis*, 217 Kan. 784, 800, 539 P.2d 304 (1975), this concept was stated as follows:

"When an act of a state legislature is assailed as void, it is only necessary to look to the federal and state constitutions for a specific restriction on that power. Thus an act of a state legislature on a rightful subject of legislation, is valid unless prohibited by the federal or state constitution. . . ."

'This court need not attempt to search out constitutional authority for enacting a challenged statute, but rather must determine if the legislation so clearly violates a constitutional prohibition as to place it beyond legislative authority. *Unified School District No. 255 v. Unified School District No. 254*, 204 Kan. 282, Syl. ¶ 2, 463 P.2d 499 (1969).' *NEA-Fort Scott v. U.S.D. No. 234*, 225 Kan. 607, 608-09, 592 P.2d 463 (1979).

In *Bair v. Peck*, 248 Kan. 824, Syl. ¶ 1, 811 P.2d 1176 (1991), we held:

'The constitutionality of a statute is presumed, and all doubts must be resolved in favor of its validity. Before a statute may be stricken down, it must clearly appear the statute violates the Constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done.'

Furthermore, '[a] statute will not be declared unconstitutional unless its infringement on the superior law of the constitution is clear beyond substantial doubt.' *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, Syl. ¶ 3, 789 P.2d 541 (1990)." 252 Kan. at 457-58.

In *McMillen*, the trial court had agreed with the school district's position that the subject legislation infringed upon vesting of the power in Article 6, § 5 to maintain, develop, and operate local public schools in locally elected boards. In upholding the legislation, we stated:

"The position of the trial court and the school district is one that has considerable support, arguably makes sense, and certainly appeals to several, if not all, of the members of this court. However, if a legislative enactment is constitutional, it is not for this court to set policy or to substitute its opinion for that of the legislature no matter how strongly individual members of the court may personally feel on the issue.

"The duty of an appellate court in considering a constitutional attack upon a legislative enactment was stated in *Harris v. Shanahan*, 192 Kan. 183, 206-07, 387 P.2d 771 (1963), as follows:

'It is sometimes said that courts assume a power to overrule or control the action of the people's elected representative in the legislature. That is a misconception. . . . The judiciary interprets, explains and applies the law to controversies concerning rights, wrongs, duties and obligations arising under the law and has imposed upon it the obligation of interpreting the Constitution and of safe-

guarding the basic rights reserved thereby to the people. In this sphere of responsibility courts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such a case lies with the people.'

See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 341, 757 P.2d 251 (1988). In *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. at 348-49, this court stated:

'The interpretation of constitutional principles is an important responsibility for both state and federal courts. In determining whether a statute is constitutional, courts must guard against substituting their views on economic or social policy for those of the legislature. Courts are only concerned with the legislative power to enact statutes, not with the wisdom behind those enactments. When a legislative act is appropriately challenged as not conforming to a constitutional mandate, the function of the court is to lay the constitutional provision invoked beside the challenged statute and decide whether the latter squares with the former— that is to say, the function of the court is merely to ascertain and declare whether legislation was enacted in accordance with or in contravention of the constitution—and not to approve or condemn the underlying policy.'

Thus, if the statute in question does not clearly contravene the provisions of § 5 of Article 6 of the Kansas Constitution, our duty is to uphold the statute, regardless of any personal views individual members of this court may have as to whether the statute is 'unwise, impolitic, or unjust.' " 252 Kan. at 461-62.

Before proceeding to the issues, some comments are appropriate. The actions herein have been well briefed, tried, and argued. The district court did an outstanding job in analyzing the issues and setting forth its decision and rationale. The parties and the district court are to be commended for their handling of the complex issues herein.

The district court referred to the plaintiffs in case No. 92-CV-1099 collectively as the "Blue Valley" plaintiffs; those in case No. 92-CV-1202 as the "Southwestern plaintiffs"; those in case No. 92-CV-1175 as the "Burlington plaintiffs"; and those in case No. 90-CV-2406 as the "Newton" plaintiffs. Where it is necessary to refer to the plaintiffs in one of the four cases, we shall use the same designation utilized by the district court.

In order to place the issues in perspective, considerable space in the opinion must be devoted to the evolutionary development of the law relative to public schools and their financing.

## HISTORICAL PERSPECTIVE

The history of public schools in Kansas commenced well before Kansas achieved statehood. The Organic Act, an Act to Organize the Territory of Kansas § 34 (1854), and the Act for the Admission of Kansas Into the Union, § 3 (1861), included provisions providing that certain sections of land be reserved for educational purposes. A Territorial Superintendent of Common Schools certified teachers and organized local school districts within walking distance of students' homes.

When passed in 1859, the Ordinance to the Constitution contained eight sections, three of which dealt with elementary public education. The framers of the constitution devoted an entire article to the establishment and finance of a system of "common schools." Section 6 of the Ordinance provided for statewide financing of schools by earmarking five percent of all proceeds from the sale of public lands for the exclusive use of the public schools.

The original Article 6 of the Kansas Constitution was adopted by the statehood convention in July 1859, ratified by the electors of the state of Kansas on October 4, 1859, and became law upon the admission of Kansas into statehood in 1861. Section 3 of Article 6 provided for funding of public education. It stated that sale of public lands, unclaimed estates, rents on public lands, "and such other means as the Legislature may provide, *by tax or otherwise*, shall be inviolably appropriated to the support of common schools." (Emphasis supplied.)

Clearly, from its creation, the State of Kansas has financed public schools through taxes and other mechanisms provided for by the legislature, not by local districts. The legislature, utilizing the authority granted under the constitution, gave school districts the power to levy ad valorem taxes within the district.

For most of its history, Kansas public schools were principally funded by local tax revenue generated pursuant to the powers and limitations granted by the legislature. Most of the various school finance acts imposed minimum ad valorem tax levies or floors as well as maximum levies or caps. In 1937, the first state aid provision was enacted when the legislature established min-

imum levels of support based upon enrollment categories. L. 1937, ch. 306. Prior thereto, less than five percent of school finances came from state aid. The nature and amounts of state aid have varied over the subsequent years, but from that point forward, state aid was always a part of the formula.

After over a century of utilization, the constitutional provisions regarding education, including school finance, came under scrutiny. Much of the impetus for the scrutiny was the unification mandated by the 1963 school unification law. L. 1963, ch. 393. The law was challenged by 148 school districts. One month after the Kansas Supreme Court rendered a preliminary decision in *Tecumseh School District v. Throckmorton,* 195 Kan. 144, 403 P.2d 102 (1965) (see 194 Kan. 519, 403 P.2d 102 [1965]), House Concurrent Resolution No. 537 was passed. L. 1965, ch. 428. The legislature directed a study to be conducted by the Kansas Legislative Council.

An 11-person citizen advisory committee was appointed to conduct research, hold hearings, make findings, and report recommendations relative to the needs of public school systems. At the time, there was an elected State Superintendent of Public Instruction and an appointed State Board of Education. The advisory committee proposed a complete revamping of this structure, noting that "members were impressed by the remarkable growth and changes in Kansas education during the past 25 years." Kansas Legislative Council, *Implementation of the Education Amendment*—Report of the Education Advisory Committee, p. vi (Publication No. 260, November 1966). As reasons for change, the committee listed: The consolidation of schools resulting in the number of school districts in Kansas being reduced from 8,624 in 1940-41 to 349 in 1966, the large growth in expenditures, and the growth in the number of Kansas school students. Seeking a structure which would allow Kansas to move into the future, the committee recommended the election of a state board of education.

In granting the State Board of Education supervisory powers, the drafters rejected a proposal for "a uniform system" operated by local boards and instead incorporated language requiring a

"comprehensive system" of local public schools under the general supervision of the state board but "maintained, developed and operated by locally elected boards." Kan. Const. art. 6, § 5. The committee stated the amendments "provide constitutional guarantees of local control of local schools." Kansas Legislative Council, *The Education Amendment to the Kansas Constitution,* p. iii (Publication No. 256, December 1965). At the same time, the amendment reaffirmed the inherent powers of the legislature—and through its members, the people—to shape the general course of public education and *provide for its financing.*

Amended Article 6 as passed by the legislature and ratified by the people in 1966, provides, in relevant part:

"§ 1. The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools . . . which may be organized and changed in such manner as may be provided by law.

"§ 2. (a) The legislature shall provide for a state board of education which shall have general supervision of public schools . . . and all the educational interests of the state, except educational functions delegated by law to the state board of regents.

. . . .

"§ 5. Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature.

§ 6. . . .

"(b) The legislature shall make suitable provision for finance of the educational interests of the state. No tuition shall be charged for attendance at any public school to pupils required by law to attend such school, except such fees or supplemental charges as may be authorized by law."

At the time of the ratification of Article 6, school finance was controlled by the State School Foundation Fund Act. L. 1965, ch. 402. This Act was the most comprehensive school finance legislation to that point in Kansas history. Fundamental to the legislation was an indexing of a geographic area's ability to fund public education. Money was then distributed commensurate with the "index" and other factors. Each county assessed a levy to

finance the state aid. School districts were also empowered to levy ad valorem taxes to fund operating expenses, but were restricted from increasing the budget to no more than 104 percent of the operating expenses per pupil in the preceding school year. L. 1965, ch. 402, § 15. If a district found this inadequate, a school budget review board could authorize additional expenditures in certain specified situations, such as where there had been "unusual occurrences." The review board consisted of the state superintendent, the state controller, and the state budget director. Hence, districts did not have the ability to raise budgets beyond the statutory limits without state authorization, even if the voters of the district wished to do so. L. 1965, ch. 402, §§ 15, 16.

In 1967, the legislature authorized school boards to seek voter approval to exceed budgetary limitations. L. 1967, ch. 409, § 18. This authorization was later repealed. In 1970, the budget limitations were replaced with the so-called "school tax lid." L. 1970, ch. 402.

The School Foundation Fund Act and related school finance statutes were determined to be unconstitutional by the District Court of Johnson County in *Caldwell v. State*, case No. 50616 (Johnson County District Court, slip op. August 30, 1972). The court found that the law failed to provide equalization aid sufficient to offset the disparity in either tax effort or per pupil operating expenditures, "thereby making the educational system of the child essentially the function of, and dependent on, the wealth of the district in which the child resides."

Responding to this decision, the legislature enacted the School District Equalization Act (SDEA) in 1973. L. 1973, ch. 292. Seeking resource equalization, SDEA distributed state aid based upon district wealth. The higher the assessed valuation and taxable income of the district, which were the measures of the district's wealth, the lower the state aid. The lower the wealth, the higher the aid. A district below the spending median was given authority to increase the district budget, upon voter approval, to the level of the median budget per pupil within the district's enrollment category or a maximum of 15 percent. L. 1973, ch. 292, § 26.

The alternative 15 percent cap was eliminated in 1978, allowing a district, upon voter approval, to raise the budget to the median

budget per pupil in the same enrollment category. L. 1978, ch. 296, § 6. In 1979, the limitation was lifted entirely, and the district was allowed to increase its budget by any amount approved by the voters. L. 1979, ch. 221, § 3.

Some of these modifications were prompted by litigation. In 1975, the constitutionality of the SDEA was challenged by numerous parties, including 41 unified school districts. The District Court of Chautauqua County found the Act unconstitutional. The legislature amended the Act, but the court did not hear further evidence and dismissed the case. On appeal, the Supreme Court reversed and remanded for further proceedings. *Knowles v. State Board of Education*, 219 Kan. 271, 547 P.2d 699 (1976). On remand, the case was transferred to the District Court of Shawnee County and the judge presiding over this division, the Honorable E. Newton Vickers, ruled the SDEA was constitutional. *Knowles v. State Board of Education*, 77CV251 (Shawnee County District Court, slip op. January 26, 1981).

The SDEA became the subject of litigation again in 1990 as several school districts and individuals, including several of the plaintiffs in this action, challenged the constitutionality of the statutes. On October 14, 1991, the Honorable Terry L. Bullock issued an opinion answering 10 questions which formed governing rules of law applicable to the challenges. *Mock v. State of Kansas*, 91CV1009 (Shawnee County District Court, slip op. October 14, 1991). The decision prompted the Governor and legislative leadership to appoint a task force to investigate legislative alternatives which would satisfy the guidelines in the decision. This task force issued a report recommending a new formula granting each district the same base state aid per pupil (BSAPP) and then allowing for certain adjustments for student needs and district size. Report of the Governor's Task Force on Public School Financing (November 2, 1991).

In 1992, the legislature repealed the SDEA and enacted the School District Finance and Quality Performance Act. L. 1992, ch. 280.

## SUMMARY OF THE ACT

Under the Act, the school board of each school district in the

state of Kansas must levy an ad valorem tax upon the taxable tangible property of the district at the rate of 32 mills for the 1992-93 school year, 33 mills for the 1993-94 school year, and 35 mills for the 1994-95 school year and succeeding years. K.S.A. 72-6431(a), (b). (The provision for 1994-95 and later years was held invalid by the district court herein and then legislatively corrected. L. 1994, ch. 7.) Except for portions of the tax which pay for principal and interest on redevelopment project bonds issued pursuant to K.S.A. 12-1774, the proceeds from the tax are deposited in the general fund of the district. K.S.A. 72-6431(c). On June 1 of each year, the district remits to the Kansas State Treasurer those revenues from the district's "local effort" which exceed the district's "state financial aid." K.S.A. 72-6431(d). The funds which are remitted are often referred to as "recapture" funds.

The funds from the "local effort" are comprised primarily of the ad valorem tax revenues (K.S.A. 72-6431), but may also be comprised of motor vehicle tax receipts; mineral production tax receipts; industrial revenue bonds and port authority bonds in lieu of tax payments; federal PL 874 Impact Aid (in accord with federal law and regulations) (K.S.A. 72-6430[e]); unexpended and unencumbered balances remaining in the district's general fund; unexpended and unencumbered balances remaining in a district's "program weighted" funds, *i.e.*, transportation, and bilingual and vocational education funds (except for the vocational fund of a district which operates a vocational school) (K.S.A. 72-6409[e]); and remaining proceeds of the former general fund and transportation tax levies prior to their repeal in 1992. K.S.A. 72-6410(e).

The district's "state financial aid" is determined by a formula of the legislatively-designated BSAPP multiplied by the district's adjusted or weighted enrollment. K.S.A. 72-6410(b)(1). The BSAPP was set at $3,600. K.S.A. 72-6410(d). The adjusted or weighted enrollment is based upon the district's full time enrollment adjusted by weighting factors which account for specified student populations to whom higher costs are associated: bilingual education students, vocational education students, at-risk students, students in low enrollment districts, students in new facilities, and students who are transported.

School districts qualify for the bilingual education weighting when their students are in a bilingual class in which bilingual services are offered through an approved program. The approved programs provide substantive instruction in core classes (math, science, social studies, and others) in the student's native language while also teaching English. The goal is to accommodate the student's transition to English-only classes. The weighting arises from the additional staffing demands of operating the program. In the formula, the bilingual education weighting is determined by multiplying the full time equivalent (FTE) enrollment in bilingual education programs approved by the State Board of Education by a factor of 0.2. K.S.A. 72-6413(a). By measuring FTE enrollment, a weighting is not provided for those portions of the day in which the student is taking English-only classes.

The vocational education weighting is only available for students enrolled in vocational education programs which are approved by the State Board of Education. The formula utilizes FTE enrollment, thus compensating for only those portions of the day in which the student is participating in the approved program. The FTE enrollment is multiplied by 0.5, which is the statutory weighting factor. K.S.A. 72-6413(b).

The weighting factor for at-risk students is 0.05. K.S.A. 72-6414. This factor is multiplied by the number of students qualifying for free or reduced meals under the national school lunch program. To receive the funds, the district must maintain an at-risk assistance plan approved by the State Board of Education. K.S.A. 72-6407(c).

Low enrollment weighting is available in districts with a regular enrollment (defined in K.S.A. 72-6407[d]) of under 1,900. K.S.A. 72-6412. During the 1992-93 school year, 261 school districts were under this level. Of the various weighting factors, the low enrollment weighting is the most significant, accounting for approximately 11 percent of the total general operating budgets adopted by all school districts in the state.

The amount of low enrollment weighting received depends upon whether the district has an enrollment of under 100 pupils, between 100 and 299, or between 300 and 1,899. K.S.A. 72-6412.

As opposed to the other weighting factors, no specific weight is specified in the statute. Rather, formulas codified at K.S.A. 72-6412(e), (f), and (g) determine the weighting to be afforded.

The new facility weighting is based upon the number of pupils in a district attending a new facility (a term not defined) multiplied by 0.25. K.S.A. 72-6415(a). This weighting is only available during the first two years of operation of a new facility and is available only to those districts which have adopted a local option budget and have budgeted the total amount authorized for the school year. K.S.A. 72-6407(i).

The final weighting factor, transportation, is determined by a formula codified at K.S.A. 72-6411. The weighting is available for pupils who reside 2.5 miles or more from school. In general, the weighting is based on cost and density factors associated with the number of pupils transported and the number of pupils per square mile. The computation relies upon utilization of the statistical method of the "curve of best fit," with the purpose of accounting for the varying costs of per pupil transportation in areas populated at different densities.

Once each of the weighting factors is determined for a district, those amounts are added to the $3,600 BSAPP multiplied by the enrollment. This is the amount available to the district unless a district was affected by the cap imposed by the "transitional state financial aid" provision of K.S.A. 72-6410(c) or unless the district adopted a local option budget.

The transitional state financial aid cap applied in the 1992-93 school year only. The cap restricted increases in each school district's operating budget to no more than 10 percent, plus enrollment growth, over the 1991-92 adjusted operating budget. The limitation applied regardless of whether the budget increase was from state financial aid or a combination of state financial aid and the local option budget. K.S.A. 72-6411(c).

School districts may adopt a local option budget in an amount which in no situation can exceed 25 percent of a district's state financial aid. A formula in the statute reduces the 25 percent figure by the same percentage as the percentage increase of any legislatively enacted increases in the BSAPP. K.S.A. 72-6433. Be-

cause of the cap imposed through the transitional state financial aid provision, some districts could not utilize the local option budget provisions or, at least, the full 25 percent allowed. Hence, in 1992-93, only 231 school districts were eligible to use the local option budget provisions. The local option budget provisions are triggered when and if the local school board determines the amount budgeted is insufficient and the adoption of a local option budget would be in the best interests of the district. K.S.A. 72-6433(b)(1).

Beginning in the 1993-94 school year, the district's adoption of a local option budget is subject to a protest petition and election if five percent of the electors in a district sign a protest petition within 30 days of the publication of the school board's resolution. If protested, the board must notify the county election officer within 30 days of the filing of the protest petition that an election is requested. If the board fails to do so, the local option budget is deemed abandoned, and the board cannot publish a local option budget resolution for nine months. K.S.A. 72-6433(b)(1).

The school board may adopt a local option budget for a period of up to four years in any amount up to the maximum allowed under the statute. The board need not, however, utilize the full amount of the local option budget authorized by the resolution. If less than the full amount is authorized, during the period of a resolution, the board may pass another resolution to increase the amount of the local option budget, following the same procedure as with the original resolution. The new resolution expires at the same time as the first resolution would have expired. K.S.A. 72-6433(b)(2), (3).

To fund the local option budget, the school district may levy local property taxes. K.S.A. 72-6435. In addition, a district may receive supplemental general state aid if the district's "assessed valuation per pupil" is at or below the 75th percentile of the assessed valuation per pupil statewide for the prior year. The supplemental general state aid is based upon an equalization methodology known as a "guaranteed tax base". A district under the 75th percentile of the assessed valuation per pupil statewide for the prior year receives supplemental general state aid in the pro-

portion of the district's assessed valuation per pupil for the prior year to the 75th percentile of assessed valuation per pupil statewide for the prior year. K.S.A. 72-6434.

In order to accomplish the mission of Kansas education (K.S.A. 72-6439), the Act also contains provisions mandating the adoption of a Quality Performance Accreditation (QPA) system for Kansas schools. Section 35 of the Act, codified at K.S.A. 72-6439, requires the State Board of Education to design an accreditation system "based upon goals for schools which will be framed in measurable terms." Ten outcomes are specified in the statute. K.S.A. 72-6439.

As part of the effort to achieve these outcomes, each district with more than one school site is required to have a school site council composed of the principal and representatives of teachers, school personnel, parents of students, the business community, and other community groups. The school site council is responsible for providing advice and counsel in (1) evaluating state, school district, and school site performance goals and objectives and (2) determining how the school will meet those goals and objectives. K.S.A. 72-6439(c)(1). The requirement of maintaining school site councils expires on June 30, 1996 unless extended by the legislature during the 1996 session. K.S.A. 72-6439(c)(3).

The QPA provisions are phased in so that all schools must participate by the 1995-96 school year. K.S.A. 72-6439(e).

The Act also imposes several other school reforms. All school districts were required to provide two days of in-service training for their personnel in 1992-93 and three days in 1993-94. K.S.A. 72-6439(g).

K.S.A. 72-1106 extends the school year in a number of respects not pertinent to the issues herein.

The Act further established a 16-member Committee on School District Finance and Quality Performance. The Committee was comprised of the chairs and ranking minority members of the House Education, Appropriation, and Taxation Committees and of the Senate Education, Ways and Means, and Assessment and Taxation Committees. Two additional members were appointed by the Governor to serve at her pleasure and two were appointed

by the State Board of Education to serve at the board's pleasure. K.S.A. 72-64a01(a).

The Committee had the duty to monitor many of the issues raised in this litigation. The Committee shall:

1. monitor implementation and operation of the Act;
2. evaluate the fairness and equity of the costs and weightings;
3. determine whether there should be additional weightings;
4. evaluate the Act's impact upon local control;
5. determine whether the Act furthers the mission of Kansas education;
6. evaluate the educational reform segments of the Act;
7. review other states' systems of finance;
8. review the $3,600 figure for sufficiency in providing "quality educational opportunities";
9. determine mechanisms for decreasing local option budget authority when base state aid or weightings increase;
10. explore alternative funding sources;
11. evaluate criteria for categorical state aid and whether entitlement formulas are equitable; and
12. make an annual report to the legislature, Governor, and State Board of Education. K.S.A. 72-64a02(a).

The sunset date for this committee was June 30, 1994. K.S.A. 72-64a02(c).

Beginning at L. 1992, ch. 280, § 55 are 10 sections which amend the Kansas Tax Code. Amendments to K.S.A. 79-32,110, 79-32,119, and 79-32,120 changed the tax rates and allowable deductions for income tax computation. L. 1992, ch. 280, §§ 55, 56, and 57. Sections 58, 59, and 60 amended the retailers' sales tax provisions, changing the rate and the items to which the tax applies. Section 61 of the Act increased the rate of the compensating use tax to the same rate as the sales tax, 4.9 percent. The mechanics of the function of the local ad valorem tax reduction fund were amended by § 62 of the Act. Section 63 amended dates and rates of credit in the county and city revenue sharing fund. Section 64 affected transfers from the state general fund of certain sales tax proceeds to the state highway fund. Finally, § 65 dealt with the effective dates of some of these provisions.

The Act details the expenditures of portions of the proceeds of these taxes. Under K.S.A. 72-6438, on January 15, March 15, and June 15 of each year, the director of accounts and reports must transfer from the state general fund to the state school district finance fund all revenue attributable to the operation of provisions of K.S.A. 79-32,110 (imposition of income tax), K.S.A. 79-3602, K.S.A. 79-3603, and K.S.A. 79-3606 (retailers' sales tax definitions, imposition of tax, and exemptions) and K.S.A. 79-3703 (imposition of compensating use tax).

The state school district finance fund may only be used for purposes of financing school districts and for no other governmental purposes. K.S.A. 72-6438(c). The monies in the fund are distributed as general state aid as provided for under the Act. K.S.A. 72-6438(d).

The Act also contains a provision regarding severability. K.S.A. 72-6440(a) states:

"If any clause, paragraph, subsection or section of the school district finance and quality performance act shall be held invalid or unconstitutional, it shall be conclusively presumed that the legislature would have enacted the remainder of the act without such invalid or unconstitutional clause, paragraph, subsection or section."

The 1993 legislature amended the Act in several respects, four of which are particularly pertinent to the issues in this suit.

First, the 1993 amendments added a declining enrollment provision to assist school districts which have a drop in enrollment when the enrollment in the current school year has decreased from the preceding school year. Under the amendment, a district may add to its enrollment for the current school year one-half of the number of pupils by which the enrollment in the current school year has decreased from the enrollment in the preceding school year. No adjustment may be made for deceases exceeding four percent of the enrollment in the preceding school year. L. 1993, ch. 264, § 8.

Second, the amendments added a mechanism by which school districts could apply to the State Board of Tax Appeals for additional taxing authority to offset start-up costs associated with opening new school facilities not otherwise covered by the new facilities weighting. L. 1993, ch. 264, § 14.

Third, the 1993 legislation changed the Act to require an adjustment to the BSAPP in the event appropriations in any school year for general state aid are not sufficient to pay a school district's computed entitlement. L. 1993, ch. 264, § 11.

Finally, the amendments adopted a concurrent resolution reconfirming support of school accreditation through QPA, but urging the State Board of Education to consider certain modifications to the QPA system as specified in the resolution. L. 1993, ch. 294.

The district court traced the legislative history of the Act and concluded the legislature had four major goals in enacting the legislation: "(1) more equitable funds for students regardless of district wealth; (2) more equitable property taxes from district to district; (3) increased funding for education; and (4) increased accountability and measurements to assess the outcomes resulting from the funding, *i.e.*, measures to improve schools and accreditation." This determination is supported by the record, and it can hardly be argued these are not legitimate legislative goals.

We turn now to the specific issues on appeal.

### INFRINGEMENT OF LOCAL SCHOOL BOARDS' AUTHORITY UNDER ARTICLE 6, § 5.

Article 6, § 5 of the Kansas Constitution provides:

"Local public schools under the general supervision of the state board of education shall be maintained, developed, and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature."

It is argued that the Act is violative of Article 6 in that the imposition of the statewide tax levy, the restriction on the local option budget, and the diminution of each school district's budget authority impermissibly infringes on the local control provision. Fiscal control is argued to be an integral part of "local control." We do not agree.

Article 6, § 6(b) provides in pertinent part:

"(b) *The legislature shall make suitable provision for finance of the educational interests of the state.* No tuition shall be charged for attendance at any public

school to pupils required by law to attend such school, except such fees or supplemental charges as may be authorized by law." (Emphasis supplied.)

The proponents of the claims made in this issue would, in effect, rewrite §§ 5 and 6 to require the State to provide direct financial aid or the means to raise tax monies sufficient to cover what each school district determines is "suitable financing" for the particular district's needs. Under this rationale, the legislature would have little or no role in the determination of what amount of finance was suitable for a particular district.

In *Chicago, R. I. & P. Rly. Co. v. Nichols*, 130 Kan. 509, 512, 287 Pac. 262 (1930), this court stated:

"Since the constitution places the responsibility for providing a system of education upon the legislature, it logically follows that a school district created by the legislature has no inherent power of taxation. It must look to the legislature for its rights to raise funds by taxation, and has only such power to levy, assess and collect taxes as is clearly granted by the legislature."

Although *Nichols* predates our present constitution, its holding is equally applicable today. Article 6, § 1 places the responsibility of establishing and maintaining a public school system on the State. Kansas school districts have no inherent power of taxation and never have had. They have always been funded through legislation. Far from supporting the proponents' arguments herein, the 1966 amendment of Article 6, § 6 specifically placed the "suitable financing" responsibility with the legislature. L. 1966, ch. 10.

Article 6, §§ 1 and 2 are pertinent to this discussion and provide:

"§ 1. The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law."

"§ 2. (a) The legislature shall provide for a state board of education which shall have general supervision of public schools, educational institutions and all the educational interests of the state, except educational functions delegated by law to the state board of regents. The state board of education shall perform such other duties as may be provided by law."

In *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 845 P.2d 676 (1993), at issue was the apparent conflict between Article 6, §§ 1 and 5. The former places responsibility for maintaining public

schools with the legislature, while the latter places it with the locally elected school boards. The challenged statute (K.S.A. 72-5443) provides for a hearing panel to make a final decision on the firing of a teacher, subject to judicial review. In upholding the statute, we said:

"It appears clear that the legislature under § 1 of Article 6 has the broad duty of establishing the public school system. The local school board's duties under § 5 of Article 6 are not self-executing but are dependent upon statutory enactments of the legislature. However, we do not imply that the legislature has carte blanche over the duties and actions of local school boards. The respective duties and obligations vested in the legislature and the local school boards by the Kansas Constitution must be read together and harmonized so both entities may carry out their respective obligations. In considering the competing provisions, we do not find that the statute in question is so unreasonable that it unduly interferes with or hamstrings the local school board in performing its constitutional duty to maintain, develop, and operate the local public school system.

"When viewed as this court must, under the presumption of constitutionality and with all doubts resolved in favor of the statute's validity, it cannot be said K.S.A. 1991 Supp. 72-5443 'infringes beyond substantial doubt' upon § 5 of Article 6 of the Kansas Constitution. See *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991); *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990)." 252 Kan. at 464.

The argument is also made herein that a school board's duties under § 5 of Article 6 are self-executing. *McMillen* specifically held they were not and is controlling herein.

The proponents on this issue cite decisions from other jurisdictions which have held fiscal control inherent in a school board's local control over its district. As the district court appropriately noted, none of these decisions involved constitutional provisions comparable to those in Article 6 and, accordingly, are not persuasive.

Utilizing the appropriate judicial review standards previously enunciated, we conclude, as did the district court, that the Act does not violate Article 6, § 5 of the Kansas Constitution in the asserted particulars. The legislature, in exercising its power to finance public schools, did not unduly impede the power of locally elected boards to establish, operate, and maintain schools.

## WHETHER THE ACT MAKES SUITABLE PROVISION
## FOR FINANCE UNDER ARTICLE 6, § 6(b)

One of the difficulties inherent in discussing the constitutional challenges to the Act is that some of the specific claims are so interrelated that it is virtually impossible to focus on them individually, but the alternative, consideration *en masse*, is so unwieldy as to be impractical. This second issue illustrates the problem.

Article 6, § 6(b) provides, in pertinent part: "The legislature shall make suitable provision for finance of the educational interests of the state."

In this issue, it is claimed the Act is violative of § 6(b) of Article 6 in that it fails to make the mandated "suitable provision." Much of the argument leads directly back to the first issue, that is, the financing provisions of the Act are not suitable because they infringe on the local control provisions of § 5 of Article 6, previously discussed.

In this issue, districts which have seen their funding reduced by the Act presented evidence of how they have had to reduce programs, personnel, etc., to accommodate the reduced funding. They argue the funding is not "suitable" when it results in cutting programs deemed necessary by the local boards of education. They acknowledge there is a wide disparity in per pupil spending but argue the legislature is improperly cutting off the mountain tops to fill in the valleys. There was testimony, however, that some school districts believed they had greater local control under the Act.

The district court correctly held that the issue for judicial determination was whether the Act provides suitable financing, not whether the level of finance is optimal or the best policy. The district court's analysis of this issue first considered decisions from other states and then analyzed Kansas law. The district court's rationale is as follows:

"6. The issue for judicial determination is whether the Act satisfies this provision, not whether the level of finance is optimal or the best policy.

"A. *Decisions From Other States*

". . . In other jurisdictions much of the recent litigation has focused upon the education clauses of the various state constitutions and charters. However, analysis of these decisions reveals that each of these decisions is necessarily controlled by the particular wording of the state's education clause and, to a lesser extent, organization and funding. Some state constitutions specifically mandate 'equality'. Others mandate 'uniformity'. Many require 'efficiency'. Some constitutions specify an explicit and significant standard such as 'high quality' or 'quality' public education. In Louisiana the standard is to provide 'excellence'. Many other states imply a lower standard such as 'thorough', 'efficient', or 'adequate'. *See* McUsic, 'The Use of Education Clauses in School Finance Reform Litigation,' 28 Harv. J. Leg. 308 (1991).

"Based upon the language of their respective state constitutions, some courts have rejected education clause challenges to public school funding legislation when the challenge is based upon the adequacy of funding or upon uniformity of funding. *See, e.g., Lujan v. Colorado State Board of Education*, 649 P.2d 1005, 1025 (Colo. 1982) (Colorado's constitution requirement of a 'thorough and uniform system of free public schools,' while mandating equal educational opportunities, does not necessitate equal expenditures per pupil); *McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156, 164 (1981) (constitution requires only an 'adequate education,' not equal educational opportunities); *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635, 647 (1975) (equal educational opportunities not required by constitutional requirement of 'general, uniform and thorough system' of public schools); *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 458 A.2d 758, 776 (1983) ('thorough and efficient' clause commands only that legislature provide the students of the state 'with a basic public school education'); *East Jackson Public Schools v. State*, 133 Mich. App. 132, 348 N.W.2d 303, 305 (1984) (provision mandating legislature to 'maintain and support a system of free public elementary and secondary schools' grants only a right to an adequate education); *Board of Education, Levittown Union Free School District v. Nyquist*, 57 N.Y.2d 27, 47-48, 453 N.Y.S.2d 643, 653, 439 N.E.2d 359, 368-69 (1982) (constitutional provision for 'the maintenance and support of a system of free schools' contemplates only 'minimal acceptable facilities and services'), *appeal dismissed*, 459 U.S. 1138 (1983); *Britt v. North Carolina State Board of Education*, 86 N.C. App. 282, 357 S.E.2d 432, 436 (1987) (state constitutional provision requiring 'general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students' mandates only equal access to schools, not a right to identical opportunities); *Board of Education of the City School District of Cincinnati v. Walter*, 58 Ohio St. 2d 368, 390 N.E.2d 813, 825, 12 Ohio Op. 3d 327 (1979), *cert. denied*, 444 U.S. 1015 (1980) (constitutional requirement that a 'thorough and efficient' education be provided mandates only that students not be deprived of 'educational opportunity'); *Fair School Finance Council of Oklahoma, Inc. v. State*, 746 P.2d 1135, 1149 (Okla. 1987) (mandate to 'establish and maintain' a public school system guarantees only a 'basic, adequate education according to

standards . . .'); *Olsen v. State ex rel. Johnson,* 276 Or. 9, 554 P.2d 139, 148 (1976) (constitution prescribing a 'uniform and general system' of schools guarantees only a minimum of educational opportunity); *Danson v. Casey,* 484 Pa. 415, 399 A.2d 360, 365 (1979) (a 'thorough and efficient' education is equated with an 'adequate,' 'minimum,' or 'basic' education); *Richland County v. Campbell,* 294 S.C. 346, 364 S.E.2d 470, 472 (1988) (constitutional requirement that legislature maintain and support public schools guarantees equal standards and equal opportunity under the method of funding chosen by the legislature).

"Even in states which the courts have upheld constitutional challenges based upon their respective education clauses, often only 'adequacy' has been required. *See, e.g., Alabama Coalition for Equity, Inc. v. Hunt,* No. CV-90-883-R (Ala. Cir. 1993) (1993 Westlaw 204083) (constitution's education guarantee accords right to 'quality education that is generous in its provision and that meet minimum standards of adequacy'); *Rose v. Council for Better Education,* 790 S.W.2d 186, 211 (Ky. 1989) (the constitutionally required 'efficient' system of public schools 'must be substantially uniform throughout the state,' providing every child in the state 'with an equal opportunity to have an adequate education'); *Helena Elementary School District No. 1 v. State,* 236 Mont. 44, 769 P.2d 684, 690 (1989) (constitution expressly provides for 'equality of educational opportunity'), *modified in* 236 Mont. 44, 784 P.2d 412 (1990) (delaying effective date of decision); *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359, 368-69 (1990) ('thorough and efficient' system will provide an 'equal educational opportunity for children' enabling each student to become 'a citizen and . . . a competitor in the labor market'); *Edgewood Independent School District v. Kirby,* 777 S.W.2d 391, 397 (Tex. 1989) ('efficient' system guarantees 'substantially equal access to similar revenues per pupil at similar levels of tax effort' so that students are 'afforded a substantially equal opportunity to have access to educational funds'); *Seattle School District No. 1 of King County v. State,* 90 Wash. 2d 476, 585 P.2d 71, 97 (1978) (constitutional language calling for 'ample provision' for a 'general and uniform' system of schools imposes a duty to 'make ample provision for the "basic education" of our resident children through a general and uniform system supported by dependable and regular tax sources'); *Pauley v. Kelly,* 162 W. Va. 672, 255 S.E.2d 859, 877 (1979) ('thorough and efficient' education is one which 'develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically').

"B. *The Standard in Kansas*

"What may be concluded from these decisions is that the analysis necessarily differs state to state. While many courts state laudatory goals for educational systems, such statements reach beyond the requirement of the Kansas constitution.

"The standard most comparable to the Kansas constitutional requirement of 'suitable' funding is a requirement of adequacy found in several state constitutions. In common terms, 'suitable' means fitting, proper, appropriate, or sat-

isfactory. *Webster's New Collegiate Dictionary* (1977). Suitability does not mandate excellence or high quality. In fact, suitability does not imply any objective, quantifiable education standard against which schools can be measured by a court. Rather, value judgments must be made regardless of whether the constitutional mandate requires that education be suitable, sufficient, appropriate, or adequate. Because these concepts are amorphous, courts have molded tests by which to assess the level of funding.

"One of the most frequently cited definitions of an adequate education was one proffered by the Kentucky Supreme Court when it iterated six goals of education: (1) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (2) sufficient knowledge of economic, social, and political systems to enable the student to understand the issues that affect the community, state, and nation; (3) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (4) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (5) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (6) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states whether competing in academics or the job market. *Rose v. Council for Better Education,* 790 S.W.2d at 212.

"Another court indicated that a sufficient education was one which 'will equip all the students of this state to perform their roles as citizens and competitors in the same society'. *Abbott v. Burke,* 575 A.2d 359, 410 (N.J. 1990).

"Most recently, these definitions were embraced by the Alabama Circuit Court, in *Alabama Coalition for Equity, Inc. v. Hunt,* No. CV-90-883-R (Ala. Cir. 1993) (1993 Westlaw 204083), after the court found that the state's constitution's education 'guarantee is one that accords school children of the state the right to a quality education that is generous in its provision and meets minimum standards of adequacy'. *Id.* at 1993 WL °52.

"The definitions in *Hunt, Rose* and *Abbott* bear striking resemblance to the ten statements or goals enunciated by the Kansas legislature in defining the outcomes for Kansas schools, which includes the goal of preparing the learners to live, learn, and work in a global society. K.S.A. 72-6439. Through the quality performance accreditation standards, the Act provides a legislative and regulatory mechanism for judging whether the education is 'suitable'. These standards were developed after considerable study by educators from this state and others. It is well settled that courts should not substitute judicial judgment for educational decisions and standards. *Finstad v. Washburn University of Topeka,* 252 Kan. 465, 475, 845 P.2d 685 (1992). Hence, the court will not substitute its judgment of what is 'suitable', but will utilize as a base the standards enunciated by the legislature and the state department of education.

"The evidence presented is that all schools in Kansas are able to meet such a standard. Some Plaintiffs, particularly Moscow [of the Southwestern group of

plaintiffs], argue that eventually the Act will result in closure of schools and even the district and, therefore, the financing will not be suitable. However, the court cannot base its judgment upon the speculation of what may happen in the future. At this time, the standards are being met. Nor is the judgment of the court controlled by the many policy concerns raised by Plaintiffs who indicted the Act for failing to ensure that per pupil spending would continue to increase in proportion with increasing needs, for not allowing local boards to make long range plans, for not providing an inflationary factor, and for fostering a spend-or-lose philosophy.

"However, the issue of suitability is not stagnant; past history teaches that this issue must be closely monitored. Previous school finance legislation, when initially attacked upon enactment or modification, was determined constitutional. Then, underfunding and inequitable distribution of finances lead to judicial determination that the legislation no longer complied with constitutional provisions. *Compare Knowles v. Board of Education*, Case No. 77 CV 251 (Shawnee County District Court, January 26, 1981) (upon remand from the Supreme Court [219 Kan. 271, 547 P.2d 699 (1976)] for evaluation of legislative modifications, finding the School District Equalization Act [SDEA] constitutional) with *Mock v. State of Kansas*, Consolidated Case No. 91-CV-1009 (Shawnee County District Court, October 14, 1991) (impliedly holding SDEA was unconstitutional). However, while the issues raised by Plaintiffs raise serious policy questions, the arguments do not compel a determination that the financing is not 'suitable' at the present time. The Act does not violate section 6 of article 6."

The 10 goals referred to in the district court's opinion are found at K.S.A. 72-6439(a), a part of the Act, and are set forth as follows:

"(1) Teachers establish high expectations for learning and monitoring pupil achievement through multiple assessment techniques;

(2) schools have a basic mission which prepares the learners to live, learn, and work in a global society;

(3) schools provide planned learning activities within an orderly and safe environment which is conducive to learning;

(4) schools provide instructional leadership which results in improved pupil performance in an effective school environment;

(5) pupils have the communication skills necessary to live, learn, and work in a global society;

(6) pupils think creatively and problem-solve in order to live, learn and work in a global society;

(7) pupils work effectively both independently and in groups in order to live, learn and work in a global society;

(8) pupils have the physical and emotional well-being necessary to live, learn and work in a global society;

(9) all staff engage in ongoing professional development;

(10) pupils participate in lifelong learning."

We agree with the district court's analysis and conclusion that the Act does not contravene the provisions of § 6(b) of Article 6 that the legislature shall make suitable provision for the financing of public education.

## EQUAL PROTECTION

The Blue Valley plaintiffs contend that certain provisions violate the right of equal protection contained in § 1 of the Kansas Constitution Bill of Rights, which provides:

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

This section is given the same construction as the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974); *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 759, 408 P.2d 877 (1965).

Before turning to the particular claims made, we must determine the appropriate level of scrutiny to be applied.

"The various levels of scrutiny employed in determining whether a statutory scheme violates equal protection guarantees recently were reviewed by the court in *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 774-75, 830 P.2d 41 (1992), wherein we stated:

'As quoted in *State ex rel Schneider v. Liggett*, 223 Kan. 610, 613, 576 P.2d 221 (1978), the United States Supreme Court has described the concept of "equal protection" as one which "emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974). Whether or not the legislation passes constitutional muster depends on the relationship borne by the challenged classification to the objective sought by its creation. . . .

'The examination of the relationship between the classification and the objective has become quite formalized. The United States Supreme Court articulates and applies three degrees of scrutiny when examining the relationship. The various levels of scrutiny were reviewed by this court in *Farley v. Engelken*, 241 Kan. 663, 669-70, 740 P.2d 1058 (1987).

'The least strict scrutiny is referred to as the "rational basis" test. Relevance is the only relationship required between the classification and the objective. In *McGowan v. Maryland*, 366 U.S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961), it was explained that "[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the

State's objective." Insofar as the objective is concerned, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 366 U.S. at 426. Thus, it appears that the legislature's purpose in creating the classification need not be established. The classification must, however, bear a rational relationship to a legitimate objective. As noted by Justice Marshall in his dissent in *Lyng v. Automobile Workers*, 485 U.S. 360, 375, 99 L. Ed. 2d 380, 108 S. Ct. 1184 (1988):

" 'The Court fails to note, however, that this standard of review, although deferential, ' "is not a toothless one." ' *Mathews v. De Castro*, 429 U.S. 181, 185 (1976), quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). The rational-basis test contains two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to those goals. In an alternative formulation, the Court has explained that these limitations amount to a prescription that 'all persons similarly situated should be treated alike.' "

'The intermediate level of scrutiny is termed "heightened scrutiny." *Farley v. Engelken*, 241 Kan. at 669. "It requires the statutory classification to substantially further a legitimate legislative purpose." 241 Kan. at 669. Another, perhaps stronger, statement of the heightened scrutiny test is that the classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976).

'The highest level of scrutiny requires that the defendant demonstrate "that the classification is necessary to serve a compelling state interest." *Farley v. Engelken*, 241 Kan. at 670. This "strict scrutiny" test has been applied by the United States Supreme Court in cases involving classifications such as race and fundamental rights guaranteed by the federal Constitution.' " *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1016-17, 850 P.2d 773 (1993).

The district court applied the rational basis test. The Blue Valley plaintiffs contend that the strict scrutiny test should have been applied or, alternatively, the heightened scrutiny test. We do not agree.

In *San Antonio School District v. Rodriguez*, 411 U.S. 1, 37, 36 L. Ed. 2d 16, 93 S. Ct. 1278, *reh. denied* 411 U.S. 959 (1973), the United States Supreme Court rejected an equal protection challenge to the Texas system of financing public schools because, *inter alia*, education was not a "fundamental right." A right is "fundamental" for purposes of equal protection analysis, the court said, if it is "explicitly or implicitly guaranteed by the Constitution." 411 U.S. at 33-34.

The *Rodriguez* court, addressing what it termed a direct attack on the way Texas chooses to raise and disburse state and local funds, turned aside this challenge, stating:

" 'The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. . . . [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. . . . It has . . . been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. . . .' *Madden v. Kentucky,* 309 U.S. 83, 87-88[, 84 L. Ed. 590, 60 S. Ct. 406 (1940)]." 411 U.S. at 40-41.

We quoted *Rodriguez* with approval in *Knowles v. State Board of Education,* 219 Kan. 271, 277-78, 547 P.2d 699 (1976), a case bringing an equal protection challenge to the SDEA, but declined, because of a limited record, to decide the constitutional issue.

Here, the district court exhaustively analyzed decisions from other jurisdictions in concluding that education was not a fundamental right requiring application of the strict scrutiny test in analyzing legislation involving the funding of public education. A portion of the district court's persuasive rationale is as follows:

"In addition to rejecting . . . the notion that the importance of education is a sufficient ground for applying strict scrutiny, many state courts have enumerated several factors which have compelled them to find that strict scrutiny is not the appropriate level of review. First, courts have noted that there is no authoritative consensus on how to provide the greatest educational opportunity for all students. As the Colorado Supreme Court noted:

'[T]hese are considerations and goals which properly lie within the legislative domain. Judicial intrusion to weigh such considerations and achieve such goals must be avoided. This is especially so in this case where the controversy, as we perceive it, is essentially directed toward what is the best public policy which can be adopted to attain quality schooling and equal educational opportunity of all children who attend our public schools. *See* M. Cox, *State Judicial Power: A Separation of Powers Perspective,* 34 Okla. L. Rev. 207, 227 (1981).'

*Lujan v. Colorado State Board of Education,* 649 P.2d 1005, 1018 (Colo. 1982).

"The other frequently cited reason is that courts should avoid excessive involvement in questions of taxation. *See McDaniel v. Thomas*, 248 Ga. 632, 647, 285 S.E.2d 156, 167 (1981); *Lujan v. Colorado State Board of Education*, 649 P.2d 1005, 1017 (Colo. 1982); *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 458 A.2d 759, 786 (1983); *Board of Education of City School District of City of Cincinnati v. Walter*, 58 Ohio St. 2d 368, 390 N.E.2d 813, 12 Ohio Op. 3d 327 (1979), *cert. denied*, 444 U.S. 1015 (1980). This reasoning follows from *Rodriguez* as approvingly quoted by the Kansas Supreme Court in *Knowles*. The United States Supreme Court noted that education presents a myriad of intractable economic and social problems. 411 U.S. at 42, 93 S. Ct. at 1031. The Court, at 41-42, 93 S. Ct. at 1301, acknowledged its lack of expertise and familiarity with the problems implicated in the raising and disposing of public revenues associated with public education.

"Closely related to this reasoning is another reason often articulated by courts in rejecting strict scrutiny. The Maryland Court of Appeals noted:

'In this regard, it must be noted that many, if not all, of these rights could, within the *Rodriguez* formulation of fundamental rights, be deemed implicitly guaranteed in most state constitutions, thereby requiring application of the strict scrutiny test—a result which the defendant[s] say is certain to wreak havoc with the ability of state legislatures to deal effectively with such critical governmental services. To conclude that education is a right so fundamental as to require strict scrutiny analysis would, the defendants say, likely render unconstitutional a substantial portion of the statutes, bylaws and practices that regulate education in Maryland. The defendants advance the further suggestion that if there must be, as the trial judge held, a compelling State interest that would justify deviation from mathematically exact dollar per pupil equality among all of the school districts, intradistrict disparities between areas, schools and even classes within schools in the same county could not be sustained. Similarly, if the right to education is fundamental, it is suggested that the State would be required to show a compelling interest for maintaining any differences among the State's school districts, even if the differences were not financial.'

*Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 458 A.2d 758, 785-86 (1983). Later in the decision, the Court recognized that these arguments by the defendants were valid, noting that the strict scrutiny test 'foreordains the invalidation of nearly every classification involving such analysis'. *Id.* at 786.

"Finally, many decisions recognize the impossibility of measuring equal protection analysis. While it may be recognized that money does make a difference in education, it is equally recognized that there are many other variables. Hence, educators, social scientists, and courts have been unable to agree on the correlation between educational expenditures and the quality of education. *See* Murnane, 'Interpreting the Evidence on "Does Money Matter"', 28 Harv. J. on Leg.

457 (1991); Ferguson, 'Paying for Public Education: New Evidence on How and Why Money Matters', 28 Harv. J. on Legis. 465 (1991). As a result it is difficult, if not impossible, to develop an ascertainable standard by which to measure equality. Few commentators or courts recommend dollar for dollar equalization. Certainly, the testimony before this court was that dollar for dollar spending does not result in equal educational opportunities. Some state courts have been aided in the development of a standard by the state constitution's statement of a benchmark or standard to measure equality. *See* McUsic, 'The Use of Education Clauses in School Finance Reform Litigation,' 28 Harv. J. on Leg. 307, 319-25 (1992). However, the Kansas education clause does not contain this requirement or a standard. Kan. Const. art. 6, § 1. *See* McUsic, 28 Harv. J. on Leg. at 325.

"Hence, a variety of persuasive reasons exist for applying a rational basis analysis to the equal protection arguments raised by the Plaintiffs. The analysis of these decisions is persuasive and leads to the determination that the rational basis test should be applied."

A look at specific provisions of the Act reflects we are not dealing with any suspect classes. Blue Valley is challenging on equal protection grounds the following portions of the Act: "The BSAPP of $3,600; the bilingual education weighting factor of .2; the vocational education weighting factor of .5; the low enrollment weighting factor; the at-risk weighting factor of .05; the school facilities weighting factor of .25; the LOB [Local Option Budget] provisions; and the SGSA [Supplemental General State Aid] provisions."

We conclude the district court was correct in applying the rational basis test herein.

That the legislation is in a legitimate area for state action cannot be disputed. The constitution mandates that the legislature establish and maintain schools and provide suitable financing thereof, as previously discussed.

In this issue, Blue Valley does not actually dispute the legislature's authority to draw lines in these categories—rather, complaint is made of where the lines were drawn. The refrain is much the same for each of the complained-of provisions—empirical studies and statistical information were lacking to support a $3,600 BSAPP, the LOB provision, the SGSA provision, and the disputed weighting factors at the time the legislature acted. Hence, the argument goes, the lines drawn lack a rational basis.

At trial, massive amounts of testimony, expert and lay, as well as scientific studies were admitted relative to the various classifications. The focus was more on dissatisfaction with where the lines were drawn than on where the lines should have been drawn. There was little agreement or exactitude in such evidence. The argument before us appears to be that a rational basis must always be grounded on and arise from scientific data. Blue Valley relies heavily for its proposition on *Thompson v. KFB Ins. Co.*, 252 Kan. 1010. At issue in *Thompson* was legislation which modified the prior law that had excluded evidence of collateral source benefits in personal injury cases to permit the introduction of such evidence in claims exceeding $150,000. The proponents argued that the "line is drawn at an approximation of the dollar amount at which the potential duplicative recovery and the potential costs of discovery of collateral source converge." 252 Kan. at 1022. This court invalidated the legislation, stating:

"The problem with the proponents' contention is that they fail to provide facts or any data upon which to make such a projection, such as that plaintiffs seeking damages in excess of $150,000 have more collateral sources available to them than those plaintiffs seeking less, or that the costs of discovery are more because a plaintiff seeks damages in excess of $150,000, or that there is a statistical relationship between the amount a plaintiff claims and the collateral sources available to a plaintiff.

"We are not presented with a set of facts upon which we can conclude the challenged classification is rationally related to a legitimate legislative purpose. Instead, we are presented with a wholly unsubstantiated assumption. Even assuming the objective of cutting insurance costs is a legitimate legislative goal, we do not find the classification in the present case will reasonably further that purpose. Under the rational basis test, great deference is given to the legislature in establishing classifications. However, where, as here, the only basis for the classification is to deny a benefit to one group for no purpose other than to discriminate against that group, the statutory classification is not only mathematically imprecise, it is without a rational basis and is arbitrary. Here, the challenged classification unreasonably discriminates in favor of claimants demanding $150,000 or less and unduly burdens those seeking judgments in excess of $150,000. We hold that the provision of K.S.A. 1992 Supp. 60-3802 which allows evidence of collateral source benefits where claimant demands judgment for damages in excess of $150,000 violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and § 1 of the Bill of Rights of the Kansas Constitution." 252 Kan. at 1022-23.

Blue Valley waves the first paragraph of the cited quote aloft in support of its position and ignores the second paragraph. The legislation in *Thompson* fell because this court held that classifying injured plaintiffs into two groups was not shown to be rationally related *to a legitimate legislative purpose*. The classification served only to discriminate against one class of injured persons. As previously noted, that a legitimate legislative purpose is involved in the Act herein is a given. Lines have to be drawn in the financing of public schools. The dispute herein is primarily over where the lines were drawn.

As was also stated in *Thompson*:

"This court has stated that '[e]stablishment of classifications with mathematic precision is not required.' *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 619, 576 P.2d 221 (1978). To the same effect, the court quoted a dissenting opinion of Mr. Justice Holmes: ' ". . . [W]hen it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." ' 223 Kan. at 619 (quoting *Louisville Gas Co. v. Coleman*, 277 U.S. 32, 41, 72 L. Ed. 770, 48 S. Ct. 423 [1928]). A statutory classification that has a reasonable basis is not violative of the due process clause simply because it is not made with mathematical precision. . . . In *Henry*, the court stated that '[t]here must be some difference in character, condition, or situation, to justify distinction . . . ; otherwise, the classification is forced and unreal, and greater burdens are, in fact, imposed on some than on others of the same desert'. (Citation omitted). 213 Kan. at 753. Although the classification need not be mathematically precise, it must have a rational basis." 252 Kan. at 1021.

The funding of public education is a complex, constantly evolving process. The legislature would be derelict in its constitutional duty if it just gave each school district a blank check each year. Reliance solely on local property tax levies would be disastrous for the smaller and/or poorer districts which have depended on state aid for many years. Rules have to be made and lines drawn in providing "suitable financing." The drawing of these lines lies at the very heart of the legislative process and the compromises inherent in the process.

As the New York Court of Appeals stated in *Levittown UFSD v. Nyquist*, 57 N.Y.2d 27, 38-39, 439 N.E.2d 359 (1982):

"The determination of the amounts, sources, and objectives of expenditures of public moneys for educational purposes, especially at the State level, presents issues of enormous practical and political complexity, and resolution appropriately is largely left to the interplay of the interests and forces directly involved and indirectly affected, in the arenas of legislative and executive activity. This is of the very essence of our governmental and political polity. It would normally be inappropriate, therefore, for the courts to intrude upon such decision-making (see *Matter of Board of Educ. v. City of New York*, 41 NY2d 535, 538; *Matter of Anderson v. Krupsak*, 40 NY2d 397, 402-403; *New York Public Interest Research Group v. Steingut*, 40 NY2d 250, 257; cf. *James v. Board of Educ.*, 42 NY2d 357)."

The New York court then applied the rational basis test and upheld the challenged legislation providing for the financing of public schools. We agree with the New York court's quoted rationale.

After carefully examining the claims made as to the complained-of provisions of the Act, we find there is a rational basis for each such provision without further discussion except for the low enrollment weighting factor.

This one provision requires further discussion as the district court held there was no rational basis therefor and, upon finding this provision was not severable, held the entire Act was constitutionally impermissible.

The weighting factors to serve students for whom additional costs are associated are: (1) program weighting for bilingual education students and vocational education students, (2) at-risk students, (3) students in low enrollment districts, (4) students in new facilities, and (5) students who are transported. Of these, the low enrollment weighting factor accounts for the allocation of the most funds of any of the weights: approximately $221 million. Although 85% of the districts received low enrollment weighting funds, this additional money affected slightly more than one-third (37%) of Kansas students. Unlike the other weighting factors, the low enrollment weighting factor is applied across-the-board to all students in the district as opposed to that number of students having the characteristic necessary for the particular weighting factor.

Plain common sense advises there is a rational basis for the allowance of extra funding for low enrollment situations. Over-

head costs for a third-grade class containing 10 "ordinary" students are virtually the same as one containing 20 "ordinary" students. A great deal of testimony was presented to the district court on low enrollment weighting factors. There was virtual unanimity in the evidence that additional funding in this area was appropriate, but little specific evidence on where the lines should be drawn. Under the Act, regressive weighting factors are applied to school districts having less than 100 full-time students, 100-299 full-time students, and 300-1,899 full-time students. In the school year 1992-93 there were three school districts in the first category, 58 in the second, and 200 in the third. Thus, 261 school districts out of a total of 304 received at least some measure of low enrollment weighting.

The thrust of Blue Valley's argument is that the 1,899 line is too high, is the result only of compromise aimed at getting additional supporting legislators, is not supported by statistical or scientific data, and has no rational basis.

The district court carefully analyzed the evidence on low enrollment weighting and held:

"[T]he record does not contain a rational basis *grounded upon education theory* for distinguishing between districts larger than 1,900 and smaller schools, especially those districts with an enrollment between 400 and 1,899 students." (Emphasis supplied.)

The emphasized portion of the holding illuminates where the district court erred. The district court acknowledged there was historical precedent in Kansas for low enrollment weighting and the establishing of categories based upon student numbers with different levels of funding. The district court further found:

"When the 1991-92 costs are graphed, the costs are quite high for small schools with a decreasing cost which flattens out on the curve. There was debate in the legislature as to precisely where the costs flattened, but generally it was in the range of 1,800 to 2,000 students. Finally, the legislature made the cutoff at 1,900. The graph then illustrates that after the flattening at about 2,000, the curve rises again at the level of 10,000."

The district court's decision was obviously based upon the expert testimony at trial which did not support the 1,899 cut-off but was inconsistent as to where a more appropriate line should

be drawn. The absence of scientific evidence at trial specifically approving the 1,899 cut-off is not determinative of whether or not the legislature had a rational basis for drawing the line where it did. We conclude there is a rational relationship between the legislature's legitimate objective of more suitably funding public schools and the classifications created in the low enrollment weighting factor. The district court erred in holding otherwise.

## MULTIPLE SUBJECTS

Some of the plaintiffs herein contend the district court erred in holding that the Act was not violative of Article 2, § 16 of the Kansas Constitution, which provides, in pertinent part:

"No bill shall contain more than one subject, except appropriation bills and bills for revision or codification of statutes. The subject of each bill shall be expressed in its title. . . . The provisions of this section shall be liberally construed to effectuate the acts of the legislature."

The purposes of the "one-subject" constitutional provision have been stated many times:

"They include the prevention of a matter of legislative merit from being tied to an unworthy matter, the prevention of hodge-podge or log-rolling legislation, the prevention of surreptitious legislation, and the lessening of improper influences which may result from intermixing objects of legislation in the same act which have no relation to each other." *Garden Enterprises, Inc. v. City of Kansas City*, 219 Kan. 620, 622, 549 P.2d 864 (1976).

" 'Log-rolling' refers to a situation in which several legislators combine their unrelated proposals and present them as separate provisions of one bill." Note, *Appropriation Bills and the Kansas One-Subject Rule*, 30 Kan. L. Rev. 625 (1982). One has only to look to federal legislation to see the evils of operating without such a provision.

We recently examined this constitutional requirement in *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, Syl. ¶ 8, 831 P.2d 958 (1992), where we held:

"Article 2, § 16, of the Kansas Constitution should not be construed narrowly or technically to invalidate proper and needful legislation, and where the subject of the legislation is germane to other provisions, the legislation is not objectionable as containing more than one subject or as containing matter not expressed in its title. This provision is violated only where an act of legislation

embraces two or more dissimilar and discordant subjects that cannot reasonably be considered as having any legitimate connection with or relationship to each other."

The Act herein is a comprehensive package. It drastically alters the method of financing public education, sets quality performance standards, and raises revenue to fund the package by a variety of means, including raising existing tax rates and earmarking the increased revenues for general state aid to school districts.

It is argued that the earmarking of these additional revenues was a ploy to avoid the requirements of Article 2, § 16 and is an example of log-rolling. To buttress this argument, reference is made to the legislative history of the 1993 legislation which amended the Act, including a report of the Kansas Committee on School District Finance and Quality Performance covering the Committee's interim study of the Act. The Committee stated:

"The new school finance law provides that the enhanced sales and income tax revenues attributable to income and corporate income tax rate increases and sales and use tax increases and exemption removal be earmarked and used for general state aid to school districts. Perhaps the main reason for the earmarking was to prevent a challenge to the constitutionality of the legislation on the grounds that it violated the 'one subject' provision of the Kansas Constitution. In other words, earmarking the new tax revenues for general state aid to school districts provided what was considered by some to be the necessary nexus between the law's taxing provisions and its school aid distribution plan. Now that the bill has become law, there is no constitutional imperative to continue the earmarking."

This subsequent. report does not destroy the natural nexus in the original bill. Everything in the Act relates to public education. The Act is a package which increased state funding and school district accountability, changed the basic policy underlying the funding of public schools, and made a variety of other public school law changes. The package was complete—the changes were set forth, and the means to raise sufficient revenue to fund the changes were included. Rather than separating the package into various components, it was presented as a package. There is certainly nothing inherently wrong in tying expenditures and the means of raising the extra revenue together in order that members of the legislature may see where revenue will come from before they vote on its expenditure.

Applying *Harding*, we conclude the Act does not embrace two or more dissimilar and discordant subjects that cannot reasonably be considered as having any legitimate connection with or relationship to each other.

## EXCESSIVE TAX AS A TAKING

The Burlington plaintiffs contend that the Act, specifically K.S.A. 72-6431(d), violates the Fifth and Fourteenth Amendments to the United States Constitution, as well as §§ 1 and 2 of the Kansas Constitution Bill of Rights. They contend that the Act's recapture provision, which results in funds from their district being used in another district, constitutes a "taking" in violation of the various constitutional provisions.

K.S.A. 72-6431(d) provides:

"On June 1 of each year, commencing on June 1, 1993, the amount, if any, by which a district's local effort exceeds the amount of the district's state financial aid, as determined by the state board, shall be remitted to the state treasurer."

Funds which are remitted, pursuant to K.S.A. 72-6431(d), are often labelled "recapture" funds. Once turned over to the State, these monies are deposited in the State School District Finance Fund and are remitted to those districts which do not have sufficient local effort to fully fund the district's state financial aid. The difference between the district's state financial aid and the district's local effort is the amount of "general state aid" to which the district is entitled. K.S.A. 72-6416.

Burlington is one of approximately 10 districts which had local tax efforts in excess of the district's state financial aid entitlement. The 10 districts contributed an estimated $14 million of recapture funds.

The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the State through the Fourteenth Amendment, *Chicago, Burlington &c. R'd v. Chicago*, 166 U.S. 226, 239, 41 L. Ed. 979, 17 S. Ct. 581 (1897), provides: "[N]or shall private property be taken for public use, without just compensation." One of the principal purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should

be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 4 L. Ed. 2d 1554, 80 S. Ct. 1563 (1960).

Nearly 100 years ago, the United States Supreme Court described a "taking":

"In our judgment the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, *to the extent of such excess,* a taking, under the guise of taxation, of private property for public use without compensation. We say 'substantial excess,' because exact equality of taxation is not always attainable, and for that reason the excess of cost over special benefits, unless it be of a material character, ought not to be regarded by a court of equity when its aid is invoked to restrain the enforcement of a special assessment." *Village of Norwood v. Baker*, 172 U.S. 269, 279, 43 L. Ed. 443, 19 S. Ct. 187 (1898).

Here, the issue is whether taxpayers in the recapture districts receive a benefit for the taxes which ultimately educate students in another school district or whether the mill levy imposed in those districts imposes such a disproportionate inequality between the burden imposed and the benefit received that it constitutes a "taking" in violation of the Fourteenth Amendment.

The trial court reasoned that, in today's society, each Kansas taxpayer benefits from the quality or suffers from the lack of quality of the education received by all Kansas students. The court stated:

"The Act embodies a recognition that in the 1990's, the State cannot thrive with a parochial attitude of educating 'our' children; in today's heterogeneous and mobile society each taxpayer benefits or suffers from the quality or lack of quality of the education received by all Kansas students. Education is the greatest vehicle available to the state to prepare our children to be the neighbors, parents, leaders, workers, taxpayers, citizens, voters, and patriots of tomorrow. Having small pockets of well-educated students does not support an economy or society in the 1990's and beyond."

We agree therewith. It is well established that a taxpayer does not, personally, have to have children in a public school before he or she benefits from public education. As stated in *Morton Salt Co. v. City of South Hutchinson*, 159 F.2d 897, 900-01 (1947):

"It is no constitutional defense to a tax that the taxpayer is not directly benefited thereby, or is less benefited than others who pay the same or less tax. [Citations

omitted.] For example, 'every citizen is bound to pay his proportion of a school tax, although he has no children, *or is not a resident*, and this applies also to corporations . . . .' Cooley, [Taxation, 4th ed., vol. 1], Sec. 89, p. 214. The fact of living in an organized society carries with it the obligations to contribute to its general welfare, whether or not the recipient of particular benefits. Furthermore, the legislative determination that the property taxed will be benefited by the public improvement for which it is assessed is ordinarily conclusive."

One cannot ignore the fact that the Act is intended to remedy some existing inequities relative to public education and its funding. One of the basic purposes of the Act is to reduce the disparity among the districts. The legislature, in enacting this legislation, viewed public education and its funding from a broader perspective. The State of Kansas is viewed as a whole for funding purposes rather than focusing on the legislatively created individual school districts. The education of each similarly situated student is to be equally funded regardless of where he or she resides. Stripped of its variables (local option budget, etc.), the Act provides that the cost of public education as a charge against taxable property will be at a uniform mill rate across the state. Thus, the cost of public education as a charge against taxable property no longer depends on where the property is located or the assessed valuation of other property in the district. It would be difficult to conclude that a uniform mill rate to fund public education is an excessive taking violative of the respective constitutional provisions.

Burlington taxpayers, primarily because of the existence in their essentially rural district of a large taxable public utility facility, have enjoyed an artificially low tax levy to fund public education. The major shift in policy in the funding of public education embodied in the Act has resulted in a dramatic rise in the district's mill levy. The excess raised is used to assist in funding less fortunate districts. However, the Burlington taxpayers are paying only the same uniform mill levy for public education as the other Kansas taxpayers.

We conclude the Act does not result in a constitutionally impermissible "taking."

## UNIFORMITY

The Burlington plaintiffs contend that the Act is violative of Article 2, § 17 of the Kansas Constitution, which provides:

"All laws of a general nature shall have a uniform operation throughout the state: *Provided*, The legislature may designate areas in counties that have become urban in character as 'urban areas' and enact special laws giving to any one or more of such counties or urban areas such powers of local government and consolidation of local government as the legislature may deem proper."

The only prohibition contained in Article 2, § 17 of the Kansas Constitution relates to laws of a general nature which affect the people of the state generally. Such laws must apply uniformly throughout the state and, thus, must be geographically uniform.

In *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 127, 631 P.2d 222 (1981), quoted with approval in *State ex rel. Stephan v. Smith*, 242 Kan. 336, 380, 747 P.2d 816 (1987), we traced the history of Article 2, § 17 from its original adoption in 1859 to the present, and concluded:

"It is important to note that the 1974 amendment of Article 2, Section 17, has completely eliminated the second sentence which provided that 'in all cases where a general law can be made applicable, no special law shall be enacted.' It is thus to be emphasized that Article 2, Section 17, of the Kansas Constitution as of 1981, simply requires that all laws of a general nature shall have a uniform operation throughout the state. The effect of this change is that the only prohibition contained in Article 2, Section 17, relates to laws of a general nature which affect the people of the state generally. Such laws must apply uniformly throughout the state and thus be *geographically* uniform. We, therefore, hold that Article 2, Section 17, of the Kansas Constitution as it exists today is not applicable to constitutional challenges based upon a denial of equal protection of the laws not involving a claim of lack of geographical uniformity."

A rational justification for treating different localities differently preserves the constitutionality of a statute under an Article 2, § 17 challenge. *Board of Riley County Comm'rs v. City of Junction City*, 233 Kan. 947, 958-59, 667 P.2d 868 (1983), and authorities cited therein. However, the basis of the differential treatment cannot be based entirely upon financial or economic considerations. *State ex rel. Stephan v. Smith*, 242 Kan. at 382.

Burlington cites three provisions in the Act to illustrate the Act's claimed lack of uniformity. The first is the Act's treatment of the Judge James V. Riddel Boys Ranch. While the Act does distinguish the residents of the Judge James V. Riddel Boys Ranch, it also requires that for the additional weighting the res-

ident must be in the custody of the Secretary of Social and Rehabilitation Services. K.S.A. 72-6407(a). The purpose for the distinction is that, under the Act, persons who are in the custody of SRS and are provided educational services at the state institution do not count in the definition of a pupil. Hence, the definition takes those at the Boys Ranch out of the operation of the definitional exclusion. Second, the provision creates a specific weighting tied to the additional needs of those children in the special circumstance of being at the Boys Ranch. The special provision relative to the Boys Ranch does not involve an issue of lack of geographical uniformity. Given the unique circumstances and needs arising from the Boys Ranch situation, the special weighting is rationally justified.

The second illustration is K.S.A. 72-6435, regarding disposition of ad valorem tax levy proceeds. This provision allows districts which have adopted local option budgets to levy an ad valorem tax to pay principal and interest on bonds for the financing of redevelopment projects under the authority of K.S.A. 12-1774. That statute gives "any city" the power to issue the bonds. Consequently, the provision is uniform throughout the state. While there will be districts with cities which have issued the bonds and others which have not, this distinction does not arise from lack of uniformity in the wording or application of either K.S.A. 12-1774 or K.S.A. 72-6435.

The third alleged instance of lack of nonuniformity relates to the fact that under the Act each district receives a different amount of money and has a different budget. The new model adopted by the legislature is one of uniform funding per similarly situated pupil. Each district, wherever located, receives the same amount per pupil as a district in which a similarly situated pupil (i.e., weighted pupil) attends school. Consequently, although per pupil spending may vary, that variance is not based on geographic disparities but rational distinctions relating to the needs of the student as recognized by the weighting system. Each district receives a different amount of money, but the difference is derived from the mathematical computation on a uniform per pupil weighted basis.

We conclude the Act does not violate Article 2, § 17 of the Kansas Constitution.

In this appeal, some issues were raised by more than one group of plaintiffs. The same issue thus may have a variety of arguments and numerous sub-issues. We have carefully considered each argument, whether or not specifically referred to in this opinion.

## CONCLUSION

The School District Finance and Quality Performance Act represents major changes in the operation and financing of public schools in Kansas. No one contends the Act is perfect. The extraordinarily elaborate review procedures provided by the provisions creating the Kansas Committee on School District Finance and Quality Performance and its inclusion of legislative leadership positions reflect legislative concern over the legislation's impact and possible need for amendment. The record herein reflects the Act has caused much concern and discomfort in a substantial number of districts. Revolutionary change to correct perceived inequity, unfortunately, almost always has such an effect. The legislature, as the people's representatives, studied the whole gamut of public school education and its funding, heard from many interested persons expressing different concerns, altered the existing public policy, and enacted this legislation into law. In so doing, to paraphrase a popular television show's preamble, the legislature decided to boldly go where Kansas has never gone before. If experience establishes that the Act needs further revision, the legislature will have ample opportunity to do so, as it has already done in a number of significant respects. Applying the appropriate standards of review to this legislation, we conclude the Act is within all asserted constitutional limitations and, accordingly, is constitutionally permissible legislation.

The judgment of the district court is affirmed in part and reversed in part, and, as the matter is before us on interlocutory appeals, the consolidated case is remanded to the district court for entry of judgment in accordance with this opinion.